**VIRGINIA:**

## IN THE CIRCUIT COURT FOR THE COUNTY OF FAUQUIER

IN THE MATTER OF                          **CASE NO. CL21-482**
**JOHN CARTER MORGAN, JR.**               **VSB DOCKET NO.: 20-000-117734**

### AGREED DISPOSITION MEMORANDUM ORDER
### FOR A ONE-YEAR SUSPENSION WITH TERMS

This matter came to be heard on Tuesday, January 25, 2022, before a Circuit Court Three-Judge panel, upon the joint request of the parties for the Court to accept the Agreed Disposition endorsed by the parties and offered to the Court as provided by the Rules of the Supreme Court of Virginia. The panel consisted of the Honorable Louise M. DiMatteo, Judge of the Seventeenth Judicial Circuit, Designated Chief Judge, the Honorable Ricardo Rigual, Judge of the Fifteenth Judicial Circuit, and the Honorable Gordon F. Willis, Judge of the Fifteenth Judicial Circuit. John Carter Morgan, Jr. was present and was represented by counsel, Robert E. Draim. The Virginia State Bar appeared through its Assistant Bar Counsel, Paulo E. Franco, Jr.. The Chief Judge polled the members of the panel as to whether any of them were aware of any personal or financial interest or bias which would preclude any of them from fairly hearing the matter to which each judge responded in the negative. Court Reporter Jennifer Hairfield, Chandler and Halasz, P.O. Box 9349, Richmond, Virginia 23227, telephone (804) 730-1222, after being duly sworn, reported the hearing and transcribed the proceedings.

**WHEREFORE**, upon consideration of the Agreed Disposition, the Rule to Show Cause, Respondent's Answer, Respondent's Disciplinary Record, the arguments of the parties, and after due deliberation, the Court rejected the Agreed Disposition and made certain recommendations regarding an acceptable disposition.

**UPON CONSIDERATION**, Bar Counsel and the Respondent accepted the Court's recommendation, and the Respondent shall receive a one-year Suspension with Terms. The Amended Agreed Disposition is attached to and incorporated in this Memorandum Order.

It is further **ORDERED** that the sanction is effective January 25, 2022.

The Respondent must comply with the requirements of Part 6, Section IV, Paragraph 13-29 of the Rules of the Supreme Court of Virginia. The Respondent shall forthwith give notice by certified mail of the Suspension of his license to practice law in the Commonwealth of Virginia, to all clients for whom he is currently handling matters and to all opposing Attorneys and presiding Judges in pending litigation. The Respondent shall also make appropriate arrangements for the disposition of matters then in his care in conformity with the wishes of his clients. The Respondent shall give such notice immediately and in no event later than 14 days of the effective date of the Suspension, and make such arrangements as are required herein as soon as is practicable and in no event later than 45 days of the effective date of the Suspension. The Respondent shall also furnish proof to the Clerk of the Disciplinary System of the Virginia State Bar within 60 days of the effective date of the Suspension that such notices have been timely given and such arrangements have been made for the disposition of matters.

It is further ORDERED that if the Respondent is not handling any client matters on the effective date of the Suspension, he shall submit an affidavit to that effect within 60 days of the effective date of the

Suspension to the Clerk of the Disciplinary System at the Virginia State Bar. The Board shall decide all issues concerning the adequacy of the notice and arrangements required herein. The burden of proof shall be on the Respondent to show compliance. If the Respondent fails to show compliance, the Board may impose a sanction of Revocation or additional Suspension for failure to comply with the requirements of subparagraph 13-29.

The Clerk of the Disciplinary System shall assess costs pursuant to ¶13-9 E. of the Rules.

A copy teste of this Order shall be mailed, to the Respondent, John Carter Morgan, Jr., at his last address of record with the Virginia State Bar, New Day Legal, PLLC, 98 Alexandria Pike, Suite 10, Warrenton, Virginia 20186, with an attested copy to: Robert Emery Draim, Hudgins Law Firm PC, 2331 Mill Road, Suite 100, Alexandria, Virginia, 22314, Paulo E. Franco, Jr., Jr., Assistant Bar Counsel, Virginia State Bar, 1111 East Main Street, Suite 700, Richmond, Virginia 23219-0026, and to the Clerk of the Disciplinary System, Virginia State Bar, 1111 East Main Street, Suite 700, Richmond, VA 23219-0026.

ENTERED THIS 25th DAY OF January, 2022

CIRCUIT COURT FOR THE COUNTY OF FAUQUIER

Louise M. DiMatteo, Chief Judge
Three-Judge Circuit Court

**V I R G I N I A :**

## IN THE CIRCUIT COURT OF FAUQUIER COUNTY

| | |
|---|---|
| **VIRGINIA STATE BAR EX REL** ) | |
| **DISTRICT COMMITTEE** ) | |
| **VSB Docket No. 20-000-117734** ) | |
| ) | |
| **Complainant,** ) | |
| ) | |
| **v.** ) | **Case No. CL 21-482** |
| ) | |
| **JOHN CARTER MORGAN, JR.** ) | |
| ) | |
| **Respondent.** ) | |

### AMENDED AGREED DISPOSITION
### (SUSPENSION WITH TERMS)

Pursuant to Va. Code Ann. § 54.1-3935, the Rules of the Supreme Court of Virginia, Part

6, Section IV, Paragraph 13-6.H, 13-24.F and 13-18.O, the Virginia State Bar, by Paulo E.

Franco, Jr., Assistant Bar Counsel and John Carter Morgan, Jr., Respondent ("Respondent"), and

Robert E. Draim, Respondent's counsel, hereby enter into the following Agreed Disposition

arising out of the referenced matter.

### I. STIPULATIONS OF FACT

1.      At all relevant times, Respondent was licensed to practice law in the
Commonwealth of Virginia.

2.      Respondent was retained to represent Jessica Scott in filing a Petition in
Bankruptcy under Chapter 7 of the United States Bankruptcy Code.

3.      On June 30, 2016, the Office of the United States Trustee brought an adversary
proceeding against Respondent and others with whom Respondent was affiliated alleging various
violations of the provisions of the United States Bankruptcy Code ("Adversary Proceeding").
The Adversary Proceeding was brought in the connection with Ms. Scott's bankruptcy
proceeding.

4.      The Adversary Proceeding was brought pursuant to 11 U.S.C. §§ 105, 307, 329,
and 526; Fed. R. Bankr. P. 2016 and 2017; Local Rules 2090-1 and 5005-4.

5.    The Adversary Proceeding resulted in a four-day evidentiary hearing before the Hon. Paul M. Black on September 25-28, 2017. At all times relevant, Respondent was represented by counsel.

6.    On February 12, 2018, Judge Black issued a Memorandum Opinion ("Memorandum Opinion") against Respondent and the other defendants. A copy of the Memorandum Opinion is attached as Exhibit 1 and incorporated herein.

7.    Based on his findings of fact and conclusions of law, Judge Black suspended Respondent's privilege to practice law before the United State Bankruptcy Court for the Western District of Virginia for a period of eighteen (18) months, and also fined Respondent the sum of $5,000.

8.    Respondent appealed Judge Black's decision to the United States District Court for the Western District of Virginia. At all times relevant, Respondent was represented by counsel.

9.    On December 11, 2019, the Hon. Michael F. Urbanski, Chief United States District Court Judge, entered a Memorandum Order ("District Court Order") affirming the practice suspension and monetary sanctions against Respondent. A copy of the District Court Order is attached as Exhibit 2 and incorporated herein.

10.    Respondent appealed the District Court Order to the United States Circuit Court for the Fourth Circuit.

11.    On April 7, 2020, the Fourth Circuit dismissed the appeal as interlocutory.

12.    The matter came back before the United States District for the Western District of Virginia. Judge Urbanski once again affirmed Judge Black's findings of fact and conclusions of law, as well as the imposition of the practice suspension and the monetary suspension against Respondent by memorandum opinion dated July 9, 2021 ("The July 9, 2021 Memorandum Opinion").

13.    On August 17, 2021, the United States Bankruptcy Court for the Western District of Virginia entered judgement and Respondent began serving his 18-month practice suspension in that court.

14.    The United States Bankruptcy Court for the Western District of Virginia meets the definition of Jurisdiction as set forth in Part 6, Section IV, Para. 13-24.A.2 of the Rules of the Supreme Court of Virginia.

15.    As a result of the final order initiating the 18-month practice suspension, the Disciplinary Board of the Virginia State Bar entered a Rule to Show Cause on September 24, 2021 requiring Respondent to show cause why the Disciplinary Board should not impose the same suspension entered by United States Bankruptcy Court for the Western District of Virginia.

16.     Respondent is already in compliance with the monetary sanction entered against him by Judge Black.

17.     Respondent filed a timely answer to the Board's Rule to Show Cause pursuant to Part 6, Section IV, Para. 13-24.C of the Rules of the Supreme Court of Virginia along with a demand for a hearing before a three-judge panel pursuant to Va. Code Ann. § 54.1-3935.

18.     On October 28, 2021, the Circuit Court of Fauquier County entered a Rule to Show Cause against Respondent, pursuant to Va. Code Ann. § 54.1-3935, returnable to January 25 and 26, 2022.

19.     In his Answer, Respondent alleges that imposition of the 18-month suspension by the three-judge panel would not be grounds for the same or similar discipline in Virginia and/or would warrant the imposition of substantially lesser discipline in Virginia.

## II. <u>PROPOSED DISPOSITION</u>

Accordingly, bar counsel and Respondent tender to the Three-Judge Panel duly

constituted and appointed pursuant to Va. Code Ann. § 54.1-3935.A for its approval of the

agreed disposition of **SUSPENSION (ONE YEAR) with Terms** as representing an appropriate

sanction if this matter were to be heard through an evidentiary hearing.  Bar counsel and

Respondent agree that the effective date for the sanction shall be the date of entry of the

Memorandum Order approving this Agreed Disposition.   The terms with which Respondent

must comply are as follows:

1.      During the period of suspension, Respondent shall complete twenty-four (24) hours of continuing legal education ("CLE") courses approved by the Virginia State Bar; 12 of those hours shall be in accordance with Respondent's mandatory obligations, and the additional 12 hours shall be in the substantive area of legal ethics;

2.      Upon completion of the hours, Respondent shall file all certificates of attendance/completion of the CLE course with the Member Compliance Department of the Virginia State Bar, and shall provide copies of such certificates to the Office of Bar Counsel;

3.      The certificates must be filed within 30 days of completion of the suspension period and this term is a condition precedent to Respondent's reinstatement;

.

Upon satisfactory proof that all terms and conditions have been met, this matter shall be closed.

If, however, any of the terms and conditions are not met by the deadlines imposed above, Respondent agrees that the Disciplinary Board of the Virginia State Bar shall impose an alternative disposition of an EIGHTEEN (18) MONTH SUSPENSION pursuant to Rules of Court, Part Six, Section IV, Paragraph 13-18.O. Respondent consents to the jurisdiction of the Disciplinary Board to determine whether or not to impose the alternative disposition set forth herein.

If the Agreed Disposition is approved, the Clerk of the Disciplinary System shall assess costs pursuant to ¶ 13-9.E of the Rules.

THE VIRGINIA STATE BAR

By: **Paulo E. Franco, Jr.** Digitally signed by Paulo E. Franco, Jr. Date: 2022.01.25 10:02:40 -05'00'

Paulo E. Franco, Jr.
Assistant Bar Counsel

John Carter Morgan, Jr.
Respondent

Robert Emery Draim
Respondent's Counsel

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| TIMOTHY JAMES WILLIAMS, JR., and | ) | |
| ANDRIAN SHANNON WILLIAMS, | ) | |
| | ) | Case No. 15-71767 |
| _____Debtors._____ | ) | |
| JUDY A. ROBBINS, | ) | |
| United States Trustee For Region Four, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adversary Proceeding** |
| | ) | **No. 16-07024** |
| DARREN DELAFIELD, UPRIGHT LAW | ) | |
| LLC, LAW SOLUTIONS CHICAGO LLC, | ) | |
| JASON ROYCE ALLEN, KEVIN W. | ) | |
| CHERN, EDMUND SCANLAN, and | ) | |
| SPERRO LLC, | ) | |
| | ) | |
| _____Defendants._____ | ) | |
| IN RE: | ) | |
| | ) | Chapter 7 |
| JESSICA DAWN SCOTT, | ) | |
| | ) | Case No. 16-50158 |
| _____Debtor._____ | ) | |
| JUDY A. ROBBINS, | ) | |
| United States Trustee For Region Four, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adversary Proceeding |
| | ) | No. 16-05014 |
| JOHN C. MORGAN, JR., JOHN C. | ) | (consolidated with Adversary |
| MORGAN, JR., PLLC, UPRIGHT LAW LLC, | ) | Proceeding No. 16-07024) |
| LAW SOLUTIONS CHICAGO LLC, JASON | ) | |
| ROYCE ALLEN, KEVIN W. CHERN, | ) | |
| EDMUND SCANLAN, and SPERRO LLC, | ) | |
| | ) | |
| _____Defendants._____ | ) | |

**Exhibit**

**1**

## MEMORANDUM OPINION

This matter comes before the Court on Complaints filed by the United States Trustee for

Region Four ("UST") against Darren T. Delafield, John C. Morgan, Jr., Upright Law, LLC

("Upright"), Law Solutions Chicago, LLC, Jason Royce Allen, Kevin W. Chern, Edmund

Scanlan, and Sperro, LLC on May 31, 2016 and June 30, 2016.  Separate adversary proceedings

were filed in the bankruptcy cases of Timothy and Andrian Williams, filed by Darren Delafield

("Delafield") as an Upright partner, and of Jessica D. Scott, filed by John Morgan ("Morgan") as

an Upright partner.  The two cases were consolidated for trial.  Sperro, LLC did not file a

response, nor has it appeared in this action.  Default was entered against it on July 15, 2016 and

August 17, 2016.  The remaining defendants are collectively referred to as the "Upright

Defendants."  Extensive discovery took place and numerous motions were heard prior to trial.  A

four day trial was conducted September 25-28, 2017, during which multiple witnesses testified

and thousands of pages of exhibits were submitted.  All parties submitted post-trial briefing once

the transcripts were prepared, which briefing was completed in late December 2017.  This matter

is now ripe for resolution.

## FACTUAL BACKGROUND

This case involves yet another collision between traditional methods of providing – and

policing – legal services to consumers for bankruptcy matters and attempts by attorneys and

creative online marketers to tap into that market on a high-volume, multi-jurisdictional basis.  On

November 15, 2015, this Court issued an opinion in which it stated:

> [T]hese cases reflect the Pandora's Box of ethical issues opened by multi-
> jurisdictional practice [through] the "national law firm" business model, where
> law firms in distant locations around the country advertise on the internet, and
> then seek to retain a local attorney to become a local "member" – albeit one with
> limited, if any, rights other than in the cases they actually take.

2

*Robbins v. Barbour (In re Futreal)*, Misc. Pro. No. 16-00701, 2016 Bankr. LEXIS 3974, at * 41-42 (Bankr. W.D. Va. Nov. 15, 2016).

Little has changed.

The UST attempts to paint Upright and by association its local "partners" as money hungry "bankruptcy boiler room" operators that have stepped over – and will continue to step over – legal and ethical lines without hesitation in their inexorable quest for the next dollar. The Upright Defendants, in turn, attempt to portray themselves as cutting-edge advocates for the financially distressed consumer. They contend they have identified a void in the legal market for consumers that they are uniquely able to fill by using technology and the internet to match underserved areas of clients with attorneys who have the capacity and ability to fill their needs on a national basis, all while staying within the bounds of the law.

This case was aggressively litigated on both sides. The Court's findings of fact and conclusions of law follow below.[1]

## FINDINGS OF FACT

### I.    Overview of the Genesis and Structure of "Upright Law"

Upright Law, LLC is a d/b/a for Law Solutions Chicago, LLC ("LSC"), an Illinois limited liability company. LSC also operates under various other assumed names, including Jason Allen Law, LLC, Allen Chern Law, Allen Chern LLC, and Allen & Associates, LLC among others. In at least one instance, Upright Law is referred to as "a service of Allen Chern Law LLC." UST Ex. 3-7. According to Kevin Chern ("Chern"), the members of LSC are Chern, Jason Royce Allen ("Allen"), and David Leibowitz ("Leibowitz"), all members of the

---

[1] Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact. *See* Fed. R. Bankr. P. 7052; 9014(c).

3

Illinois bar.[2]  Tr. 60-61, Day 3.[3]  The mangers of LSC are Chern and Allen.  Chern is the

managing partner of LSC, Allen is its chief operating officer, and Leibowitz is its chief legal

officer.

Chern has a past business history with an individual named Edmund Scanlan ("Scanlan"),

whose expertise is internet marketing, among other things.  Scanlan is not an attorney.  He holds

the title of executive director of LSC, although he holds no actual ownership interest in LSC.

Scanlan is paid a base salary of $200,000.00 by LSC for which he receives an IRS Form 1099,

presumably as an independent contractor.  LSC has very few actual employees – the ones it does

have are in-house Chicago attorneys – instead leasing most of its employees from Mighty Legal,

LLC.[4]  Mighty Legal, LLC in turn is owned by Justiva, LLC, which is owned by Chern, Scanlan,

Allen and some others not parties to this litigation.  Justiva, LLC also owns Royce Marketing,

LLC, which provides marketing services to LSC.[5]  Scanlan does not share in the profits or losses

of LSC.  However, for all practical purposes, LSC is the only client of both Mighty Legal and

Royce Marketing, and the arrangements with Mighty Legal, Royce Marketing – and ultimately

Justiva – allow for significant funds generated by LSC to flow to Scanlan, Chern, and others.[6]

Chern testified that, while working with Scanlan to provide online marketing services to

small law firms, he identified "that there was an enormous gap between the number of

consumers who are actually reaching out and saying that they need legal assistance and the

number of attorneys that are interested in proliferating information about their availability to

---

[2] Leibowitz has a less than 1% interest in LSC.  He is also a Chapter 7 panel trustee in the Northern District of
Illinois.  UST Ex. 25, pp. 30, 45.
[3] References to the trial transcript are described as "Tr." and by day of testimony.
[4] LSC pays Mighty Legal a factor of 1.1 times the actual payroll cost to Mighty Legal for its leased employees.
[5] Justiva trademarked "Upright Law" and LSC pays licensing fees to Royce Marketing, as well as fees for the use of
the domain name www.uprightlaw.com which Justiva also owns.  UST Ex. 30, Scanlan Dep. Tr. at 15; Joint
Stipulations of Fact ("Stip.") ¶ 12.
[6] Allen testified by deposition that neither he, Chern, nor Scanlan took salaries from Mighty Legal or Royce
Marketing.  UST Ex. 26, Allen Dep. Tr. 36-38.

provide services to those consumers." Tr. 55, Day 3. In 2013, Chern approached Allen, who at

the time ran LSC, and discussed joining with him to attempt to match up on a multi-jurisdictional

basis attorneys who were looking for work with consumers who needed bankruptcy assistance,

but, for a variety of factors, were unable to obtain counsel. According to their research, clients

overwhelmingly preferred not coming into "brick and mortar locations," instead they preferred

receiving legal services without the burdens of travel. This led to the establishment of a "remote

onboard process for clients," with LSC centralizing its operations in Chicago and abandoning the

traditional client office-visit arrangement. Tr. 58-59, Day 3. Unless otherwise described in this

Opinion, "Upright Law," "Upright" and "LSC" are generally referred to as one in the same.

### A. The "Onboarding" Process

The trial evidence reflected that when a prospective client searches the internet for a

bankruptcy attorney and comes across Upright Law, the client generally reaches out one of two

ways: they either call Upright Law or request information through an online request form. This

reach out, in turn, prompts a call back from a "client consultant." In 2015, Upright had a

bifurcated client intake process involving non-attorney personnel in Chicago called "client

consultants" and "senior client consultants." Client consultants were junior employees whose

job it was to gather basic information and probe whether the prospect was really interested in

filing for bankruptcy, whether they had the ability to pay for services, and whether they were the

decision maker for the family.[7] Chern, Tr. 88, Day 3. If those qualifications were met, the

prospect was passed on to a senior client consultant.

Senior client consultants were usually former client consultants who had been promoted

after a period of time. According to Chern, their job was to identify the consumer's motivations

---

[7] In 2017, Upright eliminated the title client consultant. All client consultants became "senior client consultants."
Chern, Tr. 6, Day 4.

and desires, what goals they were trying to achieve, and whether there was a precipitating event that was driving them to file. *Id.* at 88-89. These individuals are not attorneys and are paid a base salary plus commission. Sales employees were also trained in a boot-camp type arrangement. They were provided with a "Playbook," which taught them a variety of methods to "close" the sale of bankruptcy services to individuals seeking relief.

For example, UST Exhibit 37 is an Upright Law "Sales Play Book," which provides at Chapter I "Sales Rules & Theory – Close or be Closed." It includes topics such as the "Pitch Outline," the "Pitch Script," "Moving to the Close," and "Objection Handling." It is replete with high pressure sales tactics, some of which recommended to "close" the sale are unsettling to the Court.[8] Under objection handling, senior client consultants are taught to respond as follows if a prospect says "I need to pray about it":

> I appreciate that. I pray about every decision I make myself. How are you most comfortable paying? Let's pray together. I trust God won't mislead either of us. I am willing to accept God's will for the both of us.

UST Ex. 37, p. 12. Moreover, if a prospect said, "I need to talk to my Wife/Husband," senior client consultants were advised to respond with responses including: "I agree, and you should, but if your husband/wife is anything like mine, he/she never tells me no when I really need or love something, and I never tell him/her no." *Id.* Or, "[b]etter to ask for forgiveness than ask for permission, so let's get you going right away[.]" *Id.* Under the Playbook's "Now or Never" pitch, Upright sales people were advised to state as follows:

> This is the offer I am making you for right this moment in time, and it is a now or never offer as I will not be able to make this available tonight, tomorrow, or event [sic] later today. Because we have an incentive available to us right now, I am

---

[8] The word "close" is used 28 times in this 13-page document. Chern testified the Playbook was written by Allen, and that the versions of the Playbook were later revised from time to time. A number of these or similar sales techniques found their way into "Upright University" training materials. *See, e.g.*, Chern, Tr. 13-14, Day 4; UST Ex. 36.

able to offer this to you now but it expires when we get off the phone. Let's take advantage of the incentive.

UST Ex. 37, p. 7. If a prospect is already represented by counsel, sales personnel are directed to "[t]ell the client to fire their local attorney, they can send an email, then they can hire us." Upright Ex. J7, p. 11.[9]

One of the senior client consultants, Brandon Fox ("Fox"), testified by deposition that he was paid a base pay of $40,000, plus a commission tied to how may "closes" he obtained. Tr. 289, Day 1. Another senior client consultant, Angelo Walsh ("Walsh"), testified by deposition that each client consultant had a minimum requirement to meet or no bonus would be paid, and each "salesman has a specific number or amount of fees collected they need to hit in order to remain employed." Tr. 304, Day 1. The sales numbers were tallied on a 45 day basis, and changed frequently. Tr. 289, 304-05, Day 1. Fox testified that he understood he was hired to "sell[] bankruptcy to people."[10] Tr. 287, Day 1.

The non-attorneys were instructed they could not provide legal advice. Chern, Tr. 169, Day 3. Fox and Walsh confirmed that instruction. However, in several instances in the matters before the Court, those instructions were not followed by Upright non-attorney personnel.[11] The conversations with the debtors involved in this action were recorded by Upright Law, and those transcripts were introduced into evidence by the UST. UST Exs. 3-1, 4-1. Among other things, prospects were told that they were a "perfect candidate for filing for bankruptcy," and their filing chapter was pre-selected before they ever spoke to an attorney. UST Ex. 3-1, Tr. pp. 11-12, 43-45. A prospect was examined by a non-attorney to "see if you qualify to file," conceded by

---

[9] Upright Exhibit J7 is an information tutorial with a quiz at the end for training purposes.

[10] The UST, based in part on testimony from Chern, describes Upright as a "boiler room" operation. UST Brief, at 4-8; Chern, Tr. 33, Day 4. Upright vigorously disputes that characterization.

[11] Upright's current system of live call monitors now listen for instances that might constitute the unauthorized practice of law. Violations are reported to the office of general counsel. Upright has a progressive discipline system that leads to additional training and ultimately to a "three strikes" and "out" policy. Chern, Tr. 173-76, Day 3.

7

Allen to be unauthorized. UST Ex. 3-1, Tr. p. 4; UST Ex. 26, Tr. pp. 84-85. In addition, one

client was advised, after asking about whether certain debts would be included in her case, that it

would be up to the trustee to make that determination. UST Ex. 3-1, Tr. p. 21. In at least one

instance in this case, a debtor was told she could leave a debt off her bankruptcy schedules to

protect an ex-spouse.[12] UST Ex. 4-1, Tr. pp. 30-31. One prospect was given the advice to hide a

vehicle from the lender, despite Allen's testimony that such a suggestion was "off-script." Chern

confirmed such advice was outside the employee's authority. UST Ex. 3-1, Tr. pp. 75-77; Chern

Tr. 252, Day 3; UST Ex. 26, Allen Dep. Tr. p. 219.[13] All of these discussions took place before

a prospective client ever spoke with an attorney, either in Chicago or locally.

        The sales personnel were supervised by a non-attorney sales director, and that sales

director, in turn, reported to Allen. "Onboarding attorneys" in Chicago are supposed to confirm

that the non-lawyers did not provide the client with any legal advice,[14] but as seen, this check

appears less than effective based on the evidence at trial. Once a client was "closed" or sold on

bankruptcy, and money was received or payment scheduled, an "oral retention" agreement was

entered into and the client was then transferred to an attorney. No conflict check was run before

a client was presented with the oral retention agreement.[15] Among other things, the oral

retention agreement used in 2015 provided if the client is seeking to file bankruptcy under a

certain chapter of the Bankruptcy Code, that the "firm does not represent you until you talk to

---

[12] Because Brandon Fox's testimony was presented by deposition, the Court had little opportunity to weigh his credibility, but when asked if instructing debtors they could leave debts off their schedules was part of his training, he said "From what I recall, yes." UST Ex. 21, Tr. pp. 46, 59. Kevin Chern denied that. Tr. 179, Day 3. The simple fact is Fox did give this advice to Jessica Scott.

[13] This suggestion was made in connection with the "New Car Custody Program," discussed *infra*.

[14] Chern, Tr. 169-70, Day 3.

[15] Conflicts checks are done at the local attorney level, and Chern testified that the local attorneys check for client conflicts among their own client databases. No conflicts check is run by local attorneys against other local attorney's non-Upright clients. Thus, if a local attorney has his own practice and also works for Upright, no other Upright attorney can check for conflicts against that attorney's private client database. Delafield, Tr. 195-96, 206-07, Day 2. Chern contends that, practically, this is not a problem, since their local partner attorneys "generally speaking" do not represent creditors. Chern, Tr. 165-66, Day 3. The "onboarding associate," an employee in Chicago, runs conflicts checks against Upright's master database. Chern, Tr. 166-67, Day 3.

you [sic] local attorney and they accept you as a client," and that until fees are paid in full, the firm will not take action to file the case. The oral retention agreement further advises that the client acknowledges that the firm will be performing work on the client's behalf, such as by fielding creditor calls, answering client questions, and preparing the petition. In addition, "[p]ayments made are direct compensation for that work on your case and are generally non-refundable as they are earned." UST Ex. 58. The oral retention agreement provides that an electronic retainer agreement will follow which the client is obligated to sign and return. *Id.* In the Western District of Virginia, forty-eight percent (48%) of all clients paying over time never complete their payment plans, and the cases are not filed. UST Ex. 1, p. 5. In general, the fees that are not refunded are not shared with the "local partners."

### B. The Local Partners

In furtherance of its national marketing and business plan, Upright brings on local attorneys around the country as "partners," "local partners," or "limited partners." These attorneys generally have their own practices and have limited signage and advertising indicating they are affiliated with Upright. The attorneys get a different CM/ECF case filing password for their own practices, and a separate one for cases filed as an Upright partner. The local attorneys sign a limited partnership agreement that provides they have no rights in the management of the firm and only a marginal, non-voting interest in it. The attorneys are licensed in their home state.

Prior to September 2015, the senior client consultant would set up a recurring payment plan for a client to start paying his or her fee, and an engagement agreement would be generated and sent to the client. At that point, the local attorney or "limited partner" would get an email inviting the attorney to contact the client. The attorney would have forty-eight (48) hours to

9

contact the client and do the initial welcome call.[16]  Chern, Tr. 190-192, Day 3.  Assuming the

partner approved of the representation and did not have any modifications to the representation,

whether in terms of fees or the relief sought by the client, they confirmed the representation back

to Upright.  *Id*. at 191.[17]  At that point, Upright would take calls at the main office in Chicago.  If

they had a matter that required local participation, the client would be transferred or an email

sent to the partner to contact the client.  *Id*. at 191-92.  Once the client paid in full, Upright had a

team of "document collectors" who would "interface with the client and collect all of the

documents remotely."  *Id*. at 192.  An associate attorney on staff in Chicago would prepare an

initial draft of the petition and do an initial Skype interview with the client.  A second interview

and petition review would be scheduled with the local attorney, who would go over final changes

to the petition, make any changes or corrections, and then file the petition.  These meetings were

by Skype or in person.  The local attorney would attend the initial meeting of creditors.  *Id*.

After September 2015, the process was the same until the client paid in full.  At that point, Chern

testified Upright decided to pay the local partners more, but also shift to them the responsibility

of collecting information and preparing the petitions.  *Id*. at 192-93.  That system prevails

today.[18]  Upright, however, has at all times prepared in Chicago the Rule 2016 disclosures for

the local partners and continues to do so.  Chern, Tr. 197-98, Day 3.

        In early 2014, LSC/Upright was advertising on the internet that it had local offices

"nationwide."  However, at that time, it only had local partners in fourteen (14) states.  Chern,

with assistance of another attorney, took the lead on recruiting local partners, targeting attorneys

---

[16] The attorney is supposed to key the completion of this call into a quality control program. Chern, Tr. 139-40, Day 3.

[17] Presumably, this was also when a conflicts check was run by the local attorney.

[18] The prior system, with the petition being prepared in Chicago, was clearly susceptible to errors, as one petition was filed by Delafield as a member of Law Solutions Chicago, LLC d/b/a Jason Allen Law LLC, not Upright. UST Ex. 20. According to Delafield, all he could see prior to the petition being filed was the space for his name. He could not see how the field below that was populated, yet it was still filed on his behalf under his CM/ECF password.

with approximately 20 years of experience or more in consumer bankruptcy.[19] Today, Upright

has approximately 400 partners. Chern, Tr. 135-36, Day 3. Upright used to advertise that it had

"local offices nationwide," but advertises now that it has "attorneys in offices nationwide,"

presumably to squelch any concerns that it does not have any office space actually leased

anywhere but Chicago. The local partners are conducting Upright business locally out of their

individual offices, according to Chern. Chern, Tr. 155-56, Day 3. Chern testified that Upright's

website currently states that it has "attorneys in all 50 states across the nation." Chern, Tr. 156,

Day 3. Upright holds the partners out to the public with the title, style, and attribute of "partner,"

which appears on the firm's website, letterhead, business cards, and in some cases, office

signage. Chern, Tr. 187-88, Day 3. The local partners are to take reasonable steps to apprise

potential clients of their affiliation with Upright. *Id.*

In 2014, LSC/Upright was not authorized or qualified to do business in Virginia. An

affidavit from the Virginia State Bar indicates Law Solutions Chicago, LLC is not registered

with the State Bar. However, Upright Law, LLC, a Virginia limited liability company, was

formed January 9, 2015, and Allen sent a document to the Virginia State Bar to qualify it with

the Bar that same date. However, the bar qualification document was not signed by a member of

the Virginia State Bar, as required. That deficiency was ultimately corrected, and Upright was

qualified with the Virginia State Bar effective August 12, 2015. UST Ex. 57. The Virginia State

Bar has taken no action against Upright for its tardy registration, despite beginning the provision

---

[19] Chern's testimony rings hollow and is contradicted by his December 3, 2014 email to Delafield. UST Ex. 45.
Under "[r]equirements of becoming a partner" Chern advised Upright was looking for attorneys with at least five
years' experience in both Chapter 7 and 13. Moreover, Upright's alleged vetting of its local partners appears to have
been minimal, if not non-existent. The email advises that the "requirements" include a "clean disciplinary record."
In this case, it appears that meant nothing more than a certificate of good standing from the Virginia State Bar.
Morgan and Delafield both had disciplinary histories with the Virginia State Bar before joining forces with Upright,
and Delafield has received prior instruction from this Court on the proper performance of his duties due to failures to
meet his expectations before the Court. UST Ex. 63. Morgan is also a convicted felon who was once suspended by
the Bar. Chern testified that these matters were known to Upright. UST Ex. 28, pp. 13-14.

of legal services in Virginia sometime after January 23, 2014 when it confirmed its arrangement

with Morgan to provide services out of his office in Warrenton, Virginia.  UST Ex. 41.[20]

Upright began generating revenue from Virginia clients in late January or early February 2014.

### 1.   The Partnership Agreements and "Partnership"

The UST contends that the LSC local partnership structure is nothing more than a

"bankruptcy boiler room" and "telemarketing referral business," with the Chicago office as a

"referral hub," and the partnership agreements just another way "to secure another person to

attend 341 meetings and whitewash LSC's unauthorized practice of law, while [the local

partner's] purpose was to receive additional revenue with minimum input."  UST Initial Closing

Argument ("UST Brief") at 3, 8, 15.  The testimony and exhibits were voluminous on this point,

both in terms of the UST's case and Upright's response, and the Court will attempt to summarize

and condense them.  Each local partner is required to sign a partnership agreement, which is

revised and updated periodically.  Pursuant to these agreements, local partners are entitled to a

share of the revenue generated from that local partner's clients and a bonus pool formed from

revenue generated in the local jurisdiction.  These local partners receive Schedule K-1s to report

their Upright-related income, as opposed to a Form 1099 or a W-2.  Upright provides the local

partners with access to its SalesForce software system, its case management system, so that they

can log in and work on a client's file with Chicago personnel.  They also have access to

---

[20] The VSB registration is on a form for a professional limited liability company.  The registration form discloses the
Virginia members and managers of Upright Virginia as "John Morgan, Edrie Pfeiffer, and Darren Deerfield [sic]."
Delafield's name is misspelled each time it appears.  UST Ex. 57.  Chern testified that Upright Virginia was formed
after consulting with Bernard DiMuro, LSC's Virginia ethics counsel.  Further muddying the organizational waters,
Chern testified that: "After Mr. DiMuro did his research, he could not provide with a degree of certainty a definitive
opinion to us as to what was required.  In other words, his feeling was that Virginia state law was somewhat
ambiguous as to whether or not a foreign LLC could register to practice law in Virginia.  As a result of that, out of
an abundance of caution, we thought it was prudent to go ahead and set up a Virginia professional limited liability
company called Upright Law, LLC, which is a d/b/a for Upright Law, PLLC."  Tr. 64-65, Day 3.  As previously
shown, Upright Law, LLC, an Illinois limited liability company, is a d/b/a of LSC.  Upright Law, PLLC does not
appear in LSC's 2016 federal tax return as a company owned or controlled by LSC.  Despite their separate
existences, the separate Upright entities are practically referred to and treated by the Chicago managers as a single
entity.

Upright's Best Case bankruptcy software system and an Upright credit card for the payment of
filing fees. Upright also provides the local partners with malpractice insurance. Chern, Tr. 182-
88, Day 3.[21]

The partnership agreements outline the allocation of certain rights and responsibilities
between Chicago and the local partner, including the financial compensation, and Section 24 of
the partnership agreement states that limited partners have "no right to participate in the
management of the Firm." *See e.g.*, UST Ex. 43, Upright Ex. D8, Morgan Agreement, ¶ 24.
From 2014 to March 2016, Virginia residents were given fee agreements which provided that
money paid to LSC was earned on receipt. Chern contended, however, such language was not
intended to restrict or curtail the limited partners in performance of the ethical duties or abilities
to provide input into the firm's operations. During that same time frame, attorney's fees were
placed directly into either LSC's Illinois general operating account or LSC's Virginia operating
account.

Limited/local partners are invited to attend bi-monthly "partner's meetings" by
teleconference during which Chern solicits feedback about firm operations. In addition, during
months when there is no partnership conference, Chern convenes a telephone conference of the
Virginia limited partners so they have direct access to him. Chern, Tr. 183-85, Day 3. There is
also an annual partnership meeting in Chicago that limited partners are invited to attend, as well
as a partner newsletter that goes out periodically.

### 2. Local Partner John C. Morgan, Jr.

Morgan is a member of the Virginia State Bar, with his office in Warrenton, Virginia. He
is admitted to practice in the United States Bankruptcy Courts for the Eastern and Western

---

[21] LSC pays agency fees to Mighty Legal for use of the Best Case software.

Districts of Virginia. He has been disciplined twice by the Virginia State Bar, once for

contacting the represented client of another attorney in a criminal matter, and the second time for

the commission of a felony. He was suspended by the Bar for three years for the second matter.

UST Ex. 24, Tr. pp. 126-27.[22] Morgan obtained electronic filing privileges in this Court in 2005

and has engaged primarily in consumer bankruptcy cases in this Court since then.

     In early to mid-January 2014, Chern approached Morgan about joining Upright and

establishing a Virginia presence. Prior to Morgan joining Upright, Upright had no presence in

Virginia. Morgan took notes of his initial conversation with Chern. The notes reflect that

"Kevin Chern and Ed Scanlon [sic] have started a new national law firm." UST Ex. 72. Among

other things, the duties of the local partner were to do a 10-15 minute compliance call within 24 -

48 hours, the firm would take client calls and creditor calls, presumably at "headquarters" in

Chicago. The firm would prepare the petition. Morgan would be required to obtain a separate

ECF login for these cases and handle the petition signing and the Section 341 meeting of

creditors. Chapter 7 cases are said to have a "25% margin" and Chapter 13 cases have a "40%

margin."[23] *Id.* Morgan subsequently applied for and obtained a new ECF filing login for

"UpRight Law LLC" on October 9, 2014. UST Ex. 50. He filed his first case in this Court for

Upright on October 29, 2014.[24] Overall, at least nine (9) cases have been filed under Morgan's

Upright ECF password – mainly Chapter 7 cases with one under Chapter 13. Stip. ¶ 17.

---

[22] The Court takes judicial notice of the length of the suspension in the Bar's order of suspension.
http://www.vsb.org/disciplinary_orders/morgan_opinion.html.

[23] Chern followed up with an email dated January 15, 2014. UST Ex. 41. The email provided, in part, that "[a]s a
partner of the firm you will receive the following compensation: 1. Chapter 7 – 8% of the gross fee for the retention,
plus 17% of the gross fee for filing the case under the ECF you obtain for Firm filings and for attending the 341
meeting and making sure the debtor's case is completed. 2. Chapter 13 – 10% of the gross fee for the retention, plus
30% of the gross fee for filing the case under the ECF you obtain for Firm filings and for attending the 341 meeting
and making sure the debtor's case is confirmed, plus 40% of any supplemental fees attributable to post-confirmation
work. 3. Pro rata share of a pool of 10% of any revenue generated from ancillary services including litigation on
FDCPA and FCRA matters the firm generates. 4. 1% pro rata non-voting profit share with other state members of all
law firm business transacted in the state." *Id.*

[24] As the UST points out, Upright was not qualified to do business in Virginia or registered with the Virginia State
Bar at this time.

Morgan's 2016 K-1 from LSC reflected $18,620.00 in self-employment earnings from LSC.

Upright Ex. P5, pp. 85-86.[25]

### 3.  Local Partner Darren T. Delafield

Delafield has long appeared before this Court, and the Court is well familiar that his

practice consists primarily of representing consumer debtors in Chapter 7 and Chapter 13 cases.

Delafield first obtained ECF filing privileges in this Court in October 2004. As mentioned

above, he has received prior admonition from this Court with instructions as to the future

handling of cases, as well as a private reprimand from the Virginia State Bar. UST Ex. 63.

In early December 2014, Chern solicited Delafield to become a local partner of Upright.

On December 3, 2014, Chern sent Delafield a pitch email, which provided, in part, as follows:

> Our goal at UpRight is to improve people's lives by providing the highest quality
> services, most effective legal strategies and world class customer service. I firmly
> believe that the only way to accomplish that end is to leverage both our incredible
> systems, technology and operations at our headquarters in Chicago and the intense
> subject matter expertise of local practitioners like you. We strive to be America's
> premier virtual consumer law firm that is geographically agnostic, representing
> clients in both rural and metropolitan areas, and allowing consumers to interact
> with their lawyer online, the same way they transact business with their banks and
> other professionals.

UST Ex. 45.[26]  Delafield signed a partnership agreement with LSC/Upright shortly thereafter.

UST Ex. 46.

---

[25] Upright Ex. P5 is LSC's 2016 Federal Tax Return, which is currently under seal. Redacted versions of the K-1's
of Morgan and Delafield will be unsealed. The remainder of the return will remain under seal, absent further order
of the Court. While the Court sees no need to disclose the total gross revenues of LSC as reflected on the return,
they are substantial. The Court further notes that through June 30, 2017, Upright had filed 190 cases in the Western
District of Virginia, and it had received payments from 757 people (joint representation of spouses is treated as one
person). Total fees paid to Upright, including filing fees, were $821,156.52 in this district. Total fees paid in cases
actually filed equaled $409,650.22, including filing fees, all through June 30, 2017. UST Ex. 1, p. 5.

[26] The January 2015 Chern email also reflected the change in compensation from 2014, providing that the new
compensation structure was as follows: "1. Chapter 7 – 25% of the gross fee. 2. Chapter 13 – 40% of the gross 'no
look' fee, plus 40% of any supplemental fees attributable to post-confirmation work. 3. Pro rata share of a pool of
10% of any revenue generated from ancillary services including litigation on FDCPA and FCRA matters the firm
generates. 4. 1% pro rata non-voting profit share with other state members of all law firm business transacted in the
state." UST Ex. 45.

Delafield applied for an ECF login for "UpRight Law LLC" by application dated January

9, 2015, which was promptly issued. He filed his first Upright case in this Court on January 10,

2015. In total, more than thirty (30) cases have been filed by Upright in this Court though

Delafield's login, with seven (7) cases having been filed before Upright was properly registered

with the Virginia State Bar. Stip. ¶ 19.[27] Delafield's 2016 K-1 from LSC reflected $21,741.00

in self-employment earnings from LSC. Upright Ex. P5, pp. 189-90.

## C. The "New Car Custody Program" or "Sperro Program"

Chern testified he met an individual named Brian Fenner ("Fenner") as a result of both

having attended the National Association of Consumer Bankruptcy Attorneys annual conference

in Chicago in 2015. Fenner was a sponsor and exhibitor, and he obtained Chern's name off a list

of attendees. Prior to 2015, Fenner had long experience in the repossession industry. Fenner

owned and ran multiple companies, including Collateral Services of Indiana, LLC, Sperro, LLC,

and Fenner & Associates, LLC.

Chern testified that Fenner described a service he provided called the "New Car Custody

Program" or the "Sperro Program." As described by Chern, Fenner pitched this program as a

service to consumer debtors who wanted to surrender their car in bankruptcy. Fenner explained

that his service facilitated the return of collateral to the auto finance company by having the

debtor turn the car over to Fenner, and Fenner would in turn notify the finance company that he

has the car, and if desired, he would return the car to the finance company. Chern contends that

---

[27] From October 24, 2014 to September 30, 2015, Delafield was affiliated with another high volume consumer
bankruptcy law firm, known generally as "Prince Law," that was based in Florida, advertised over the internet, and
referred prospects to a local "member" for filing. Prince Law and a different local member were held in civil
contempt and barred from filing cases in this Court after the Court found they engaged in a variety of ethical and
rule violations. *See In re Futreal*, No. 15-70886, 2016 WL 2609644 (Bankr. W.D. Va. May 5, 2016), and *In re
Futreal*, 2016 Bankr. LEXIS 3974. Curiously, the Court recognizes Edrie Pfeiffer, footnote 20, as another Virginia
based Prince Law alumni now affiliated with Upright.

Fenner advised him that Fenner would give the finance company the option of using Fenner's

auction services, or they could pick the car up from Fenner.

Chern testified Fenner's program interested him because Fenner offered to pay the legal

fees for consumers who were interested in participating in it.[28]  As is the case in many

bankruptcy cases, clients struggle to come up with the fees to pay their attorneys, as well as

filing fees.  One of the benefits of the program gleaned from Chern's testimony was that this

would enable a consumer debtor who wanted to surrender his or her vehicle to have the

attorney's fees paid by a third party such that the debtor did not have to go out of pocket, and it

would eliminate the delay in filing precipitated by an installment payment plan that a debtor may

or may not complete.

In May 2015, Chern told Fenner he would ask Leibowitz to contact Fenner and

investigate the "risks/rewards" of participating in Fenner's program.  Leibowitz did that,

although he testified he only reviewed the "risks," and Chern advised Fenner that they would be

moving forward.  On May 11, 2015, Fenner emailed Chern, after being told he passed the "smell

test," stating as follows:

> Wonderful, attached is a copy of our standard towing and storage agreement.
> Please advise if there is anything you would like changed. Depending on the
> region where the collateral is picked up, the only change we make is the lot
> location where the collateral is stored. *That being either Nevada, Mississippi, or
> Indiana.*

UST Ex. 35-10 (emphasis added).

---

[28] Before Fenner made his pitch, Chern testified he had heard of a "vehicle recovery program" being run by an
attorney named Max Gardiner while attending a "bankruptcy boot camp" run by Gardiner in North Carolina. Chern
testified that through Gardiner's boot camp, he also met other lawyers who had vehicle recovery programs. Chern
testified he thought, "hey, there are other lawyers who are doing this legitimately in other parts of the country.  This
is something that I should seriously consider." Chern, Tr. 81-82, Day 3.  Chern acknowledged that the Sperro
Program was unlike the Gardiner program, in that Gardiner did not tow cars out of state and he gave lenders a date
in the future after which charges would start to accrue if the vehicle was not picked up. Chern, Tr. 15-16, Day 4.

This was the beginning of a scam.

Fenner sent another email to Chern on May 12, 2015, advising of their hookup fees,

towing rates, and impound fees.  Fenner advised Chern as follows:

> To perfect our lien process, we hold the car for 30 days. This is a state statute. At
> the 31st day the account would be in default status.  This will generate the lien
> process.  We then send both the consumer and the lien holder notification by
> certified letter via US post office. We follow the lien process accordingly to witch
> [sic] state we are storing the collateral. At this time, the lien holder will make
> their choice on how they wish to move forward.
>
> I believe that if you put in the BK petition that Fenner & Associates paid for the
> BK and that the collateral is stored at Collateral Services of Indiana LLC with our
> address, collaterals [sic] location. This should be more than enough notification to
> the lien holder and the court the intent, location and status of the collateral.
>
> We have to hold the vehicle so many days before we can perfect our lien by state
> law.  We also need some time to generate a profit margin. I would prefer not to
> send notification to the lien holder from the existing attorney up front. The Lien
> holder would already be notified in the petition. Any attempts to speed the process
> would eliminate our perfection of the lien as well as cutting our profit.

UST Ex. 35-18.

On May 18, 2015, Chern asked Fenner for a copy of any correspondence that other

attorneys in his program used to notify lenders that the collateral was in Sperro's possession,

along with a copy of a petition to show how the compensation was disclosed to the bankruptcy

court. UST Ex. 35-30.  Fenner replied that no other attorneys sent such correspondence to

creditors and advised that the entity paying the fees should be disclosed as Fenner & Associates.

*Id.*  Fenner also asked that letters not go out to creditors until at least five days passed from pick

up, in order to give the collateral time to reach his storage facility in Indiana.  *Id.*

On June 18, 2015, Chern sent an email to all Upright partners advising "New Car

Custody Program at UpRight Law – Read Carefully." UST Ex. 35-53. Fenner was blind copied

on the email.  In that email, Chern advised his limited partners that Upright's senior client

18

consultants had started offering a new program to clients to surrender a vehicle to a towing and

storage facility and have the cost of their bankruptcy case fully subsidized. In order to qualify,

Chern advised that the following conditions needed to be met: (i) the client wanted to file

Chapter 7, (ii) the client has a vehicle he or she is willing to surrender, (iii) there is no equity in

the vehicle, and (iv) the vehicle is worth greater than $5,000.00. *Id.* The client is advised to

contact Fenner's company "Sperro," and to arrange for Sperro to take custody of the vehicle. At

the time of surrender to Sperro, the client signs a towing, storage and custody agreement with

Sperro whereby the client contracts with Sperro to load the vehicle, tow it to a facility, store and

maintain it until such time as the finance company picks up the vehicle. *Id.* Chern advised his

colleagues that Sperro charges "customary and reasonable fees for these services (e.g. $75

loading fee, $1.50 per mile towing, $45/day storage, etc.)." *Id.* Chern advised that Upright – not

Fenner – notices the finance company by certified mail "within a couple of days that Sperro has

custody of the vehicle, the location of the storage facility, contact information for Sperro and

instructions that they should recover the vehicle as soon as possible to avoid excessive storage

fees." *Id.*

The benefits to the clients were also described. Chern told his local partners that the

client can immediately cancel the insurance. The client no longer has to maintain it or worry

about the expense or inconvenience of plating or storing a vehicle. The client does not have to

worry about the repossession agent showing up at home or at work. The creditor can be referred

to Sperro as to the status of the vehicle. The client does not have to worry about finance

companies who refuse to pick up a vehicle, and "[i]mmediately upon placing the vehicle in

Sperro's custody, Sperro will remit the entire legal fee plus filing fee to UpRight Law on client's behalf." *Id.*[29]

An Upright limited partner named Mark Steinberg in Miami, Florida immediately questioned the program after it was rolled out, and on June 18, 2015, Chern told Steinberg as follows: "[t]hey hold the car in one of three states that allow for mechanic's liens that trump the 1st lien. 60% of the time, they pick up the car and satisfy the charges. 40% of the time they just abandon the vehicle. Sperro really makes its money when the finance company abandons and Sperro auctions it off." UST Ex. 35-55.[30] So, at least as early as June 18, 2015, Upright senior management knew that Fenner and his companies were towing cars out of states like Florida (and as will ultimately be seen, Virginia) to Fenner-related storage lots in Nevada, Mississippi, or Indiana for the purpose of trying to prime secured lenders, or hold their collateral hostage, with excessive hookup, towing and storage fees that were completely unnecessary. But, Fenner and Sperro were willing to pay Upright's clients' attorney's fees and filing fees in order to get the referral from Upright to do it. Also significant to the Court is that all of this was offered to prospective clients by Upright using "senior client consultants" without the clients ever having spoken to their local attorney before being placed into the program,[31] and Chern was negotiating with Fenner for Sperro "to pay our marketing company $150 for each deal we generate from

---

[29] The June 18, 2015 email stated, under "Due Diligence," that "Kevin Chern reviewed the program in detail with Felicia Burda, our UST Counsel, Mary Robinson, or [sic] Professional Responsibility Counsel, and David Leibowitz, General Counsel of UpRight Law and Head of Litigation." UST Ex. 35-53. Chern testified Ms. Burda was a former attorney with the U.S. Trustee's Office, and that Ms. Robinson was a former disciplinary attorney with the State of Illinois. Chern, Tr. 76-77, Day 3.

[30] Steinberg's response was, in part, "I guess it just seems like it is cheating the unsecured [sic] creditor. And I need to add that it pains me to type that sentence because I have a general disdain for most of my clients' creditors. But you have clearly presented the scenerio [sic] to people who are well positioned to give a recommendation, so I am not going to object." *Id.*

[31] Regina White, a former Upright client, who was ultimately represented by Delafield outside of the Upright relationship, participated in the Sperro Program before being dropped by Upright as a client. White testified that she "kept asking them are you sure this is legitimate because I don't want to go to jail. . . . But you know, they assured me it was legal and legitimate and I trusted them to know what they were talking about." White, Tr. 241-42, Day 1.

partners . . . ."  UST Ex. 35-54, a June 18, 2015 email from Chern to Fenner.[32]  As will be seen

below, Chern further authorized the dissemination of letters to finance companies over the names

of Upright's local partners from the Chicago office, and listing the local attorney's addresses as

Chicago, without the knowledge of some of those attorneys.

Chern testified that he decided to terminate Upright's participation in the New Car

Custody Program on or about November 19, 2015 due to a variety of factors, one of which was

Chern learning from one of his limited partners that a lawsuit was filed by Ally Financial against

Sperro and others alleging that the defendants in that case were complicit in converting its

collateral.  At that point, after reviewing the allegations in Ally's complaint, Chern decided that

Upright should not refer any more clients to Sperro until the court ruled in that litigation.  Chern,

Tr. 86, 104-05, Day 3.  In October, Chern was also getting concerned with Fenner and Sperro

becoming increasingly tardy with the payment of Upright's attorney's fees, even though they had

picked up client vehicles.  *Id.* at 105-06.  Finance companies also started complaining to Upright

about Sperro's excessive towing and storage fees.  *Id.* at 107-08.

### D.  Debtors Timothy and Andrian Williams

Timothy and Andrian Williams are "assisted persons" who filed a Chapter 7 bankruptcy

petition in this Court on December 22, 2015.[33]  Stip. ¶ 28.  They are husband and wife, residing

in Smyth County, Virginia.[34]  In August 2015, the Williamses were experiencing financial

trouble, and Ms. Williams began searching the internet for bankruptcy options.  In a search,

Upright Law came up, and she filled out an online information request form.  Her husband was

---

[32] It is unclear to the Court who "our" is in this email, but it appears to be one of the entities Chern and Scanlan own
together, as opposed to LSC/Upright.  It is also not clear whether these funds were ever paid, but the effort was
clearly made by Chern to squeeze what he could out of the Sperro Program.

[33] Mrs. Williams' legal name is "Andrian," not "Adrian," which caused some confusion in the proper filing of her
petition.

[34] Both Mr. and Mrs. Williams testified at trial, and both were earnest, forthcoming, and credible witnesses.  They
were, unfortunately, caught in the crossfire between the UST and Upright through no demonstrable fault of their
own.

contacted by an Upright representative by telephone later the same day. The calls between Upright and their prospective clients were recorded, including the calls with the Williamses. The Williamses spoke to Upright, in part, because other attorneys they had spoken to in the past would not assist them unless they had money to pay their fees. Williams, Tr. 97-98, Day 1.

The Williamses advised Upright they were being called by various creditors, in particular, GCB Acceptance Corp. ("GCB"), the secured lender on their Ford Taurus. Ms. Williams was becoming stressed about the calls. Mr. Williams spoke with Upright's client consultants and he was informed Delafield would be his local attorney. The total attorney's fees and filing fee quoted were $1,985.00. The Williamses wanted to return the Ford Taurus to GCB, but GCB only offered refinancing even though they were seriously delinquent. After going through their financial situation with a client consultant named Alexis Ball, Mr. Williams was told "you seem like the perfect candidate for filing for bankruptcy. We definitely want to help you get your financial independence back. . . . And I think filing bankruptcy would help you do that." Stip. ¶ 29, UST Ex. 3-1, Tr. p. 11-12.

Mr. Williams had inquired about continuing to pay on several payday loans, and Upright's non-attorney consultant advised him "it's going to be up to the trustee whether or not they're going to include those into the bankruptcy . . . ." UST Ex. 3-1, Tr. p. 21. Later, when told by a senior client consultant that his credit score would go up by 85 to 135 points after he filed bankruptcy, Mr. Williams apparently decided to include the payday credit loans, stating that "I mean, now that I know that . . . filing bankruptcy is going to help my credit, yeah." *Id*. at 35, 40. The senior client consultant then advised "it just makes sense to just get rid of everything . . . if you continue to hold on to that and you miss a payment, it's going to ruin your credit while we're trying to build it for you . . . ." *Id.* at 40.

Once the Williamses mentioned their issues with the Taurus, one of Upright's senior client consultants brought up the Sperro Program as a way to get GCB dealt with and to have their attorney's fees and filing fee paid at the same time. The Williamses, before they ever had a chance to consult with their local attorney, were asked to call Sperro directly and talk to them about surrendering their car and having their attorney's fees and filing fee paid. Once Sperro sold the car, and their fees were paid, the Williamses would be refunded any fees they had paid toward Upright in the interim.[35] In one conversation with senior client consultant Angelo Walsh at Upright, Mr. Williams advised he was being contacted by GCB about the car and indicated that GCB advised they would pick it up if a payment was not made. Walsh, in turn, reminded Mr. Williams that Sperro would be contacting him to pick up the car, and that if he turned it over to GCB he would likely get nothing for it. Walsh advised Mr. Williams, that although it was up to him, "in this situation, if I were you, I would keep it hidden and we come get it, and at least pay off some of your bankruptcy . . . ." UST Ex. 3-1, Tr. pp. 75-76.

Mr. Williams questioned the legality of the Sperro Program with a non-Virginia licensed Upright attorney named Ryan Galloway. Mr. Galloway told Mr. Williams the Sperro Program was legal. Stip. ¶ 32. Mr. Williams later spoke with an Upright onboarding attorney named Jacob Brown, and Brown explained the Sperro program was like parking a car in a fire lane. The car gets towed to a lot, then the finance company has to pay the towing company and lot owner to get it back. "And so that's like where Sperro makes all their money," Brown told Mr. Williams. UST Ex. 3-1, Tr. pp. 87-88. "So, it's totally fine . . . ," Brown said. *Id.* At no time in the recorded call transcripts does it appear that any Upright personnel told the Williamses the cars were being towed out of state.

---

[35] Upright sought an immediate credit card payment to confirm the representation. UST Ex. 3-1, Tr. pp. 33, 47-48.

Sperro sent the Williamses a transportation and storage agreement, and the Williamses signed an agreement with Sperro. Sperro had the vehicle picked up and transported it from the Williamses' residence in Smyth County, Virginia to Sperro's facility in Indianapolis, Indiana. The security agreement between the Williamses and GCB provided that the Williamses agreed, among other things, "not to sell, encumber or abandon the Collateral," and "not to remove or attempt to remove said collateral from the county and state given above as my address without notifying you in writing . . . ." Stip. ¶ 37.

Upright then emailed Delafield to approve the representation. On September 1, 2015, Delafield spoke with the Williamses and confirmed his representation to them as an Upright partner for their Chapter 7 bankruptcy case. However, on September 4, 2015, without ever having spoken to Delafield, Sperro picked up the Ford Taurus and towed it away. Sperro sold the car at auction on or about October 9, 2015. Stip. ¶ z. On September 8, 2015, someone at Upright mailed a letter to "General Acceptance Corporation" in Greenville, North Carolina, supposedly the lender for the Taurus, when the actual lender was GCB in Johnson City, Tennessee. UST Exs. 3-7, 3-9.[36] The letter advised the lender, albeit the wrong one, that, after identifying the Williamses, the collateral, and VIN on the Taurus,

> You are hereby notified that on September 1st, 2015 my client placed the above-captioned collateral, upon which you allege to hold a security interest, into the custody of Sperro Towing and Recovery, located at 2534 Bluff Road, Indianapolis, Indiana 46225. Please contact Sperro to arrange to recover the vehicle . . . . To avoid unnecessary storage and maintenance fees, please contact them immediately.

---

[36] This was not a one-time event. On September 15, 2015, Upright sent a virtually identical letter, this one to "Ally," regarding a Delafield client named Shannon Chapman. UST Ex. 64. A template document was admitted by which Upright could plug in any local partner's name. UST Ex. 35-29.

UST Ex. 3-7.  A telephone number was provided.  The letter was closed by the signature line

Darren Delafield, 79 W Monroe, 5th Floor, Chicago, IL 60603.  Delafield neither saw nor

authorized this letter before it went out.[37]

On September 21, 2015, LSC deposited a $1,650.00 check from Fenner & Associates

into LSC's operating account and deposited a $335.00 check from Fenner & Associates into an

IOLTA account.  Stip. ¶ 38.  The October 16, 2015 engagement agreement with Upright

described the fees charged to the Williamses as "Attorney's fees: $1600.00; Court Filing Fees:

$335.00; and Report Fees: $50.00. Total Fees, $1985.00."  Stip. ¶ 39.  The Rule 2016 disclosure

reflected the attorney's fees were paid by "Sperro."  UST Ex. 3-15, p. 92.  The Williamses met

with Delafield several times by Skype and their petition was ultimately filed on December 22,

2015.

The Sperro Program came to light at the Williamses' 341 meeting, and Delafield denied

knowing why Sperro paid the Williamses' fees in connection with their case.  Stip. ¶ 40.

However, Delafield admitted at trial he knew as early as December 2015, as the Williamses had

told him, that the car had been used to pay their fees.  Delafield, Tr. 143-44, Day 2.  Delafield

also admitted in his Answer to the Complaint that he received the June 18, 2015 email about the

New Car Custody Program from Chern.  UST Ex. 3-33; Delafield, Tr. 142-43, Day 2.  At the 341

meeting, Delafield attempted to deflect any questions regarding Sperro by the Trustee and

GCB's counsel to an unidentified "senior attorney" at Upright for further explanation, professing

ignorance as to the relationship between Sperro and Upright.  UST Ex. 3-2.  The Chapter 7

[37]Chern's explanation as to the letters sent out over Delafield's name without his knowledge or permission
referenced back to the June 18, 2015 roll out email for the Sperro Program.  "So, I believed, at the time, that my
June 18th memo to my partners notified the [sic] that we were going to be sending a letter out to the finance
companies notifying them that Sperro was in custody of the vehicle, notifying them to pick up the vehicle, you
know, quickly to avoid excessive charges, etcetera.  It didn't have Mr. Delafield's signature on it.  It has his name on
it as the attorney who was going to be representing the debtor throughout Upright Law.  I regret that I didn't do a
better job of communicating to the partners that their names would be placed on those letters.  That was a mistake on
my part."  Chern, Tr. 110-11, Day 3.

25

Trustee referred the matter to the UST, and a motion for a Rule 2004 examination was filed and granted by Order on March 15, 2016.[38] Treating joint debtors as a single client, not less than 219 clients of LSC participated in the Sperro Program, of which 7 resided in the Western District of Virginia. UST Ex. 62; Stip. ¶ 27. Nationally, Upright generated not less than $333,545.00 in fees from the Sperro Program, exclusive of filing fees, before it was terminated. Tr. 340-44, Day 2.

### E. Debtor Jessica Dawn Scott

Jessica Dawn Scott ("Scott") is an "assisted person" who filed a Chapter 7 petition with this Court on February 24, 2016. Stip. ¶ 41. Scott first learned of Upright through an internet search and understood it to be a law firm based in Chicago with partnerships throughout the United States. Scott searched the internet, and Upright came up early in her search. Like the Williamses, Scott told Upright that she was interested in surrendering a car, and Upright told her about the Sperro Program. Scott spoke with Brandon Fox, an Upright senior client consultant, on October 14, 2015. When asked if she knew what Chapter she wanted to file, Scott said "Whichever wipes out everything." Fox replied: "Okay. So Chapter 7 definitely." UST Ex. 4-1, Tr. p. 13. Scott had a 2005 Pontiac Sunfire she wanted to surrender financed with Credit Acceptance Corporation. Regarding the Sperro Program, Fox explained,

> "... so it's a partnership that we have with a repossession company. So they work out a deal with the bank . . . they come and pick up the vehicle. Now rather than you having a repossession sitting on your – on your record, we're going to file a bankruptcy. So any debt that you have is removed off of your record. . . . And whatever the balance is of that vehicle that we get, the check, we refund you all of that money back.

---

[38] On March 14, 2016, Chern emailed Delafield and advised "Please set up a time for the client to be prepped by you and me in advance of the hearing and advise him not to talk to anyone until then about the circumstances surrounding the placement of the car with Sperro." UST Ex. 3-18.

UST Ex. 4-1, Tr. pp. 13-14. Later, on October 19, 2015, Scott spoke to Fox again and inquired

about a debt she had co-signed with her ex-spouse. The exchange went as follows:

> Scott: . . . like my ex and I have a loan together. Like what happens with that?
> Fox: Okay. So if you're both on a loan, you'll be taken off of all responsibility of
> the loan and he'll be fully responsible.
> Scott: Oh, God, that sucks.
> Fox: Now if you want to keep that loan though, we can keep it off and you can
> continue to pay on it . . . .
> Scott: But I still don't want to screw him over.
> Fox: Okay. Well I mean, we can leave that off, that's not a problem.

UST Ex. 4-1, Tr. pp. 30-31.

On October 20, 2015, Scott executed an engagement agreement with Upright. Scott's fee

agreement stated that the total fee for her bankruptcy, including filing fees, was $1,835.00. Scott

made a $100.00 payment to LSC as a partial payment toward its attorney's fees. On or about

October 24, 2015, Scott spoke to Morgan over the telephone for an initial consultation and he

approved her as a client. The first time Morgan ever met with Scott in person was when she was

deposed in this case, although he did talk to her over the telephone. Scott met with Morgan's

wife, Rhonda, who is his assistant in his law practice.[39] She is not an attorney. Morgan did not

review Scott's petition or schedules with Scott, and Morgan did not witness Scott sign them

either. This was delegated entirely to Rhonda Morgan.[40] The filings with the Court were replete

with errors, including (1) the Rule 2016 disclosure failed to reflect the proper amount of fees

paid to Upright, (2) the Rule 2016 disclosure failed to reflect that the fees were paid by Sperro

and/or Fenner & Associates, (3) the Statement of Financial Affairs indicated that the 2005

---

[39] Morgan's deposition testimony was frank: "Q. Who sat down physically and reviewed these petition and
schedules with Jessica Scott? A: [Morgan] My wife, Rhonda. Q. So, you did not review the petition and schedules
with the debtor, correct? A. [Morgan]: Not with the debtor, correct." UST Ex. 24, Tr. pp. 49-50.

[40] As a witness, the Court found Morgan to be defiant, unremorseful and wholly lacking in credibility. When
questioned by the Court why Morgan and his associate attorney allow his wife to go over petitions and schedules
with consumer debtors, and also obtain their signatures, Morgan testified: "Between the three of us, I would say that
my wife has a superior knowledge of the law and the conduct of the signing and the elements of the bankruptcy
petition. We often ask for her advice." Morgan, Tr. 66, Day 4.

Pontiac Sunfire was "attached, seized, or levied," and (4) the Statement of Financial Affairs indicated that she transferred no property to anyone within the two years of filing bankruptcy. UST Ex. 4-10.

A former associate in Morgan's firm named James McMinn, who had no relationship to Upright other than working for Morgan in his separate private practice, attended the 341 meeting, and as in the Williamses' case, the Sperro Program came to light when questions were raised about what happened to the Sunfire and who paid the attorney's fees. Morgan said he had Scott's permission to have someone else appear on his behalf, but he has no confirmation of that fact. His own time records reflect he attended the 341 meeting, when clearly he did not. UST Exs. 4-3, 24, Tr. p. 95.

Scott's security agreement with Credit Acceptance on the Sunfire provided in part as follows:

> You promise that you will not remove the vehicle from the United States or Canada. You will not sell, rent, lease or otherwise transfer any interest in the vehicle or this contract without our written permission. You will not expose the vehicle to misuse or confiscation. You will not permit any other lien or security interest to be placed on the vehicle.

Stip. ¶ 45. Sperro towed the Sunfire from Virginia to Indiana, and by letter dated November 9, 2015, Sperro appears to have advised "Lien Holder" that Scott's car was towed to Indiana, and that "reasonable fees [are] still due and owing at this time in the amount of $3,258.80 for the towing, storage and related service expenses for the Vehicle . . . ." UST Ex. 4-2, p. 7. The lien holder was advised that if the foregoing charges were not paid in 15 days, the vehicle would be sold at public auction in Indiana on November 28, 2015 in furtherance of its mechanic's lien under Indiana law. *Id.*[41] On November 17, 2015, Fenner & Associates paid Upright $1,650.00

---

[41] The address to which this letter was mailed, if it was mailed, is unclear. Brian Fenner was never deposed in connection with this litigation. What the car actually sold for, when, and to whom are unknown.

for Scott's attorney's fees plus $335.00 for the filing fee. Morgan's initial Rule 2016 disclosure filed with the Court reflected that Scott paid Upright $1,500.00 plus $335.00 for the filing fee. UST Ex. 4-10, p. 50. There was no reference to Sperro having paid any fees in that document.

McMinn discussed Scott's meeting of creditors, held on March 23, 2016, with Morgan when he returned to the office. More than two months passed before Morgan attempted to correct Scott's schedules, statements, and other papers filed in connection with the case. Stip. ¶ 53. On June 7, 2016, Morgan filed an amended Rule 2016 disclosure, and he also filed an amended Statement of Financial Affairs ("SOFA"), which purports to bear Scott's signature under oath. Scott did not sign it and she did not know about it until she was deposed. In that SOFA, Morgan inserted that Sperro, LLC paid Upright Law LLC an attorney's fee of $1,650.00 and the filing fee of $335.00. Stip. ¶ 55, UST Ex. 4-11, 4-12. The amended SOFA does not disclose any of the funds LSC drafted from Scott's checking account, nor does it reflect that Sperro picked up the Sunfire. *Id.* Scott ultimately received a Chapter 7 discharge on July 1, 2016.

### F. **Assertion of the Attorney Client Privilege in Discovery**

The Williamses and Scott are not parties to this litigation. There is no assertion by the UST that they did anything wrong, and there never has been. The Court finds both the Williamses and Ms. Scott to be caught up in this dispute through no fault of their own. None of the Debtors appears to have done anything more than seek out help due to severe financial distress, and rely on whoever was advising them what to do, be it an Upright sales person in Chicago or their local attorney. They did not know where else to turn, and it is truly unfortunate they have been drawn into this maelstrom.

29

As part of the preparation for trial, subpoenas were served on the Williamses and on Scott

by the UST. Discovery had previously been served on one or more of the Upright Defendants

earlier in the case in which the attorney-client privilege was raised – not between Upright and its

litigation counsel, but between the Upright Defendants and their bankruptcy clients. May 9,

2017 Transcript at pp. 4-5 (docket no. 76). According to counsel for the UST at a hearing on

May 9, 2017, counsel for the litigants in this case agreed that since the Upright Defendants'

counsel was not comfortable about asking the bankruptcy clients if they wanted to waive the

attorney-client privilege, it was agreed that the UST would send Rule 45 subpoenas to the

bankruptcy clients, and if those clients wanted to assert the attorney-client privilege, they could

do so in response to those subpoenas. *Id.* Counsel for the Upright Defendants did not dispute

this agreement.

        Scott was served with the subpoena on April 10, 2017, and she produced documents to

the UST on April 26, 2017. However, on April 27, 2017, with counsel for the Upright

Defendants having represented they were uncomfortable discussing the attorney-client privilege

with the bankruptcy clients, objections to the Scott subpoena asserting the attorney-client

privilege were served on the UST by Morgan. This objection, however, was prepared behind the

scenes by an attorney named David Menditto ("Menditto"), Upright's in-house litigation

counsel.[42] Menditto apparently "mistakenly" put Morgan's name on the subpoena objection.

        In addition, despite his own employer's actions being at issue, Upright, through Menditto,

used heavy handed tactics, including text messages, to try and get the Williamses to sign conflict

waivers, even though the UST informed the Court that Mr. Williams called the UST on April 27,

---

[42] Menditto attempted to appear *pro hac vice* on behalf of the Williamses and Scott at the May 9, 2017 hearing on
the UST's motion to compel. The UST objected, and the Court sustained that objection. At the hearing on May 9,
2017, counsel for the Upright Defendants stated ". . . Mr. Menditto was brought in to assist in responding to the
subpoenas . . . ." May 9, 2017 Tr. at p. 28. However, when pressed by the Court, counsel could not say who
brought him in.

2017 and advised he did not want to sign one. UST Ex. 3-20; May 9, 2017 Tr. at 17. Menditto

sent the Williamses a conflict waiver letter dated April 20, 2017, which suggested, among other

things, that the Williamses' discharge might be at issue, despite telling them later by text

message there was no allegation they did wrong. Compare UST Ex. 3-19 with UST Ex. 3-20, p.

11. While there is a suggestion that they could receive advice from other counsel, the proposed

conflict letter was heavily tilted toward having the Williamses waive any conflicts and let

Upright continue to represent them. Upright had to know, as a practical matter, the Williamses

had limited resources to hire separate counsel.

> Mr. Williams emailed Menditto on April 26, 2017, stating that:

>> So, right now, I trust no one. I was told by "my lawyer" that if I did not sign the waiver that he would be solely looking out for himself only. He actually came out and said, "I will say what I have to, to save myself." [Referring to Darren Delafield]. . . . I don't want to be defended by anyone like that, nor anyone who employs or goes into partnership with someone like that. If he is like that, then no wonder we are in the situation we are in with this case. We followed horrible advice when knowing nothing of legal matters. We were 21 and 20 when this started! I hope and pray that noone [sic] else comes to your firm for help. I don't believe that there is anyone at the firm or your partners that are truly in it to help people get out of financial trouble, but instead create more and at the same time, make money yourselves. Whether it is legal or not. *I am done speaking.*[43]

UST Ex. 3-20, pp. 3-4 (emphasis added). Nevertheless, Menditto continued to persist in trying

to get Mr. Williams to talk to him, clearly to lobby him to sign the conflict waiver so he could

assert the attorney-client privilege on their behalf and attempt to shield their files and Upright's

from discovery. *Id.*

---

[43] At trial, Delafield denied the comments attributed to him.

31

## CONCLUSIONS OF LAW

### I.    Jurisdiction and Venue

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§

1334(a) and 157(a) and (b) and the delegation made to this Court by Order from the District

Court on December 6, 1994, and Rule 3 of the Local Rules of the United States District Court for

the Western District of Virginia.  This Court further concludes that these matters are "core"

bankruptcy proceedings within the meaning of 28 U.S.C. § 157(b)(2)(A).  *See In the Matter of*

*Kenneth W. Paciocco*, Misc. Pro. No. 15-00302-KRH, 2015 WL 5178036 (Bankr. E.D. Va. Sept.

3, 2015).  A request for sanctions arising out of an attorney's conduct in a core proceeding is

itself a core proceeding.  *See, e.g., In re French Bourekas, Inc.,* 183 B.R. 695, 696 (Bankr. S.D.

N.Y. 1995).

### II.    The UST's Requests for Relief

The UST has asserted six counts against the Upright Defendants and Sperro.  Count I of

the Complaints each asks the Court to order Delafield, Morgan, LSC, and Upright to disgorge

fees under Section 329(a) and Section 105(a) of the Bankruptcy Code.  Count II of the

Complaints seek disgorgement of fees under 11 U.S.C. § 329(b) against Delafield, Upright,

Morgan, and LSC.  Count III of the Williams Complaint requests voiding of the fee agreement

and disgorgement under 11 U.S.C. §§ 526(c)(1) and 105(a) against Delafield, Upright and LSC.

Count III of the Scott Complaint and Count IV of the Williams Complaint seek an injunction

against Delafield, Morgan, Upright and LSC, enjoining them from violating 11 U.S.C. § 526.

Count V of Williams Complaint and Count IV of the Scott Complaint seek civil penalties under

11 U.S.C. § 526(c)(5)(B) against Delafield, Morgan, Upright Law LLC, and LSC, and Count VI

of the Williams Complaint and Count V of the Scott Complaint seek sanctions against all

32

Defendants under the Court's inherent powers.  This last Count asks the Court to prohibit

Delafield, Morgan, LSC, Upright Law, LLC, Allen, Chern, and Scanlan from practicing before

this Court whether directly or indirectly through any companies in which they have ownership

interests or management authority.  The UST contends that cause also exists to sanction them

monetarily.  The Court is also asked to require Sperro and its affiliates to disgorge all funds

received as a result of the Sperro Program, and to enjoin Sperro and its affiliates from remitting

or providing any funds to LSC or Upright Law, LLC or to an affiliate, member, or agent of either

of those entities.  In both Complaints, the UST further requests that the Court "take such action

as the court deems necessary to deter such misconduct and similar schemes in the future."

### III.    Williams and Scott Counts I and II and Williams Count III: 11 U.S.C. §§ 329(a), 329(b), 526(c)(1) and 105(a)

Section 329 of the Bankruptcy Code provides as follows:

(a) Any attorney representing a debtor in a case under this title, or in connection
with such a case, whether or not such attorney applies for compensation under this
title, shall file with the court a statement of the compensation paid or agreed to be
paid, if such payment or agreement was made after one year before the date of the
filing of the petition, for services rendered or to be rendered in contemplation of
or in connection with the case by such attorney, and the source of such
compensation.

(b) If such compensation exceeds the reasonable value of any such services, the
court may cancel any such agreement, or order the return of any such payment, to
the extent excessive, to — (1) the estate, if the property transferred — (A) would
have been property of the estate; or (B) was to be paid by or on behalf of the
debtor under a plan under chapter 11, 12, or 13 of this title; or (2) the entity that
made such payment.

11 U.S.C. § 329.  As stated in *In re Levin*, Case No. 97-15574DWS, 1998 WL 732878 (Bankr.

E.D. Pa. Oct. 15, 1998), "[o]ne of the surest means for the bankruptcy system to come under

public disrepute is for the perception to take hold that it allows attorneys to milk the last cent out

of debtors while leaving creditors nothing.  Also disturbing is the prospect that attorneys may be

able to extract a premium from debtors who are desperate to file in order to save an asset that is

on the brink of being lost. These concerns, among others, have led Congress and the Courts to

enact and enforce strict regulations on the payment of attorney's fees in bankruptcy. One of the

cornerstones of the regulatory structure is the necessity for attorneys to fully and honestly

disclose their transactions with clients." *Levin*, 1998 WL 732878, at *2.

Section 329 reflects the Congressional concern that a debtor's payments to his attorney

present a "serious potential for evasion of creditor protection provisions of the bankruptcy laws."

H.R.Rep. No. 95–595, at 329 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6285.

> To that end, an attorney must "lay bare all [his] dealings" with the debtor
> concerning compensation. *In re Saturley,* 131 B.R. 509, 517 (Bankr. D. Me.
> 1991). The disclosures he makes must be "precise and complete." *Berg,* 356
> B.R.at 381 (internal quotation omitted). "Coy or incomplete disclosures" that
> force the court "to ferret out pertinent information" will not do, *Saturley,* 131 B.R.
> at 517; *see also Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–
> Helena Corp.),* 63 F.3d 877, 881 (9th Cir. 1995), even if they are merely the result
> of negligence or inadvertence, *Jensen v. U.S. Trustee (In re Smitty's Truck Stop,
> Inc.),* 210 B.R. 844, 848-49 (10th Cir. BAP 1997). Very simply, "[a]nything less
> than the full measure of disclosure" is unacceptable. *Saturley,* 131 B.R. at 517.

*In re Jackson*, 401 B.R. 333, 339-40 (Bankr. N.D. Ill. 2009).

Because disclosure under Section 329(a) and Rule 2016(b) is "central to the integrity of

the bankruptcy process," failure to disclose is sanctionable. *In re Andreas,* 373 B.R. 864, 872

(Bankr. N.D. Ill. 2007). The sanctions can include partial or total denial of compensation as well

as partial or total disgorgement of fees paid. *Id.* "Many courts, perhaps the majority, punish

defective disclosure by denying all compensation." *Id.; see, e.g., Mapother & Mapother, P.S.C.

v. Cooper (In re Downs)*, 103 F.3d 472, 477-78 (6th Cir. 1996). However, other courts consider

the egregiousness of the conduct and the facts of a given case. *See Charity v. NC Financial*

*Solutions of Utah, LLC (In re Charity)*, No. 16-31974-KLP, 2017 WL 3580173, at \*26 (Bankr.
E.D. Va. Aug. 15, 2017).[44]

### A. Mootness

The Upright Defendants contend the UST's claims against them in Counts I, II, and III of
the Williams Complaint, and Count I and II of the Scott Complaint are moot, because, prior to
trial, they refunded to the Williamses and Scott all of the fees paid to LSC/Upright on both the
Williamses' and Scott's behalf.[45]  In Scott's case, Fenner & Associates sent extra funds on
Scott's behalf, and the Upright Defendants advise they are prepared to deliver those additional
funds, $100.00, to whomever the Court directs.  Because they have already surrendered the funds
to the Debtors, the Upright Defendants contend that any relief for disgorgement is moot.  *See
e.g., In re Bradley*, 495 B.R. 747, 792 (Bankr. S.D. Tex. 2013).  The Upright Defendants, in
effect, assert there is no case or controversy left for the Court to resolve as to the above
referenced Counts, and there is no need to cancel any contracts, because the contracts are fully
performed and the debtors have received their discharges.  In essence, the Upright Defendants
assert there is nothing left for Upright, Delafield, or Morgan to perform in their cases, and
cancelling a fully performed contract is basically a useless act.

As stated in *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754 (4th Cir. 2011):

> "[T]he doctrine of mootness constitutes a part of the constitutional limits of
> federal court jurisdiction. . . . [A] case is moot when the issues presented are no
> longer 'live' or the parties lack a legally cognizable interest in the outcome."

---

[44] "...[T]he Bankruptcy Code and Rules impose no requirement on debtor's counsel in a chapter 7 case to obtain
court *approval* of his or her fees. . . . Rather, the duty is simply one of *disclosure*, with the court having the power to
disapprove fees to the extent they are determined to be excessive *if* the reasonableness of the fees is raised either by
the debtor or the United States Trustee, or by the court on its own motion. *See Burd v. Walters (In re Walters)*, 868
F.2d 665 (4th Cir. 1989) (bankruptcy court had power to reduce fees of attorney hired by debtor to litigate against
creditor in another forum from $29,000 to $15,000 even though the fees were being paid from exempt funds rather
than estate assets)." *In re Hooper*, No. 93-11599-AB, 2001 WL 34054526, at \*9 (Bankr. E.D. Va. Oct. 29, 2001).

[45] The Court denied a motion to dismiss to that effect shortly before trial.  Docket Nos. 162, 173, 189.

*United States v. Hardy,* 545 F.3d 280, 283 (4th Cir. 2008) (internal quotation marks and citations omitted). *See also Iron Arrow Honor Soc'y v. Heckler,* 464 U.S. 67, 70, 104 S.Ct. 373, 78 L.Ed.2d 58 (1983) ("Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to actual cases or controversies."). "Mootness has been described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (quoting *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)).

*Id.* at 763. The UST contends that the forgoing Counts are not moot, and that there is a live case or controversy.

First, as to Count I of each Complaint, brought under Section 329(a) and 105(a), the UST contends that the Upright Defendants failed to "disclose completely and accurately the compensation paid in this case, in particular both the ultimate source of the compensation and the sharing of compensation between the various entities involved." Williams Complaint, ¶ 84; Scott Complaint, ¶ 83. In both Complaints, the UST asks the Court to use its authority under Section 105(a) to require to LSC, Upright, Delafield and Morgan "to disgorge all fees."[46] This request is made in the body of Count I, whereas the requests for relief at the conclusion of all counts are much broader.

Part of what the UST is targeting in Count I of the Complaints is the allegation that LSC is not a law firm, and that the Rule 2016(b) disclosures are inaccurate and misleading under Section 329(a) and Rule 2016(b). Rule 2016(b) provides, in part, that "[t]he statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required." Fed. R. Bankr. P. 2016(b). Count I of the Complaints

---

[46] In the Williams Complaint, the UST also asked that the Defendants be required to provide "restitution of the full value of the converted property," but this request was withdrawn prior to trial at the hearing on the motion to dismiss.

asserts that the "precise nature of the fee arrangement must be disclosed, not merely the identity

of the ultimate owner of the funds," and the Upright Defendants had an obligation to ensure the

filing of an accurate statement under Section 329(a) and Rule 2016(b). "Despite this, they failed

to disclose completely and accurately the compensation paid in this case, in particular both the

ultimate source of the compensation and the sharing of compensation between the various

entities involved." Complaints, Count I. Here, after this litigation commenced, the Upright

Defendants contend that they paid the Williamses $1,650.00 and Ms. Scott the sum of $1,835.00.

Thus, since the UST asks for disgorgement of those funds, the Upright Defendants assert there

would be no point in the Court ordering them to do what they have already done, and there is no

need to delve into the Rule 2016(b) disclosures.

      The Court disagrees. There are approximately 15 additional cases pending in this Court

in which the UST has questioned the issue of fee sharing under LSC's business model and the

adequacy and manner in which its Rule 2016(b) disclosures are prepared and filed with the

Court.[47] In several of those cases, the UST alleges that her Office "has filed several other

motions against[, among others,] LSC and Upright Law and alleged a pattern and practice of

misrepresentations to the Court regarding the details concerning fees and fee sharing.". *See, e.g.,*

Motion to Review Debtor's Transactions with Debt Relief Agencies and Order Disgorgement of

Attorney Fees Paid, *In re Holtz*, No. 16-50742 (docket no. 11). In *Knox v. Service Emps. Int'l*

*Union, Local 1000,* 567 U.S. 298, 132 S.Ct. 2277 (2012), the Supreme Court held that "[a] case

becomes moot only when it is impossible for a court to grant . . . any effectual relief whatever to

the prevailing party. . . . [A]s long as the parties have a concrete interest, however small, in the

outcome of the litigation, the case is not moot." (citations omitted). *Id*. at 2287. Moreover,

---

[47] The Court takes judicial notice of its own docket. The additional cases are set for a status conference on March
19, 2018.

There is a well-recognized exception to the mootness doctrine holding that "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982); *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot.").

The voluntary cessation exception "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001). Accordingly, the exception seeks to prevent "a manipulative litigant immunizing itself from suit indefinitely, altering its behavior long enough to secure a dismissal and then reinstating it immediately after." *ACLU of Mass. v. U.S. Conference of Catholic Bishops*, 705 F.3d 44, 54–55 (1st Cir. 2013) (citing *Already, LLC v. Nike, Inc.*, – U.S. –, 133 S.Ct. 721, 727, 184 L.Ed.2d 553 (2013)); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). To that end, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at 190, 120 S.Ct. 693.

*Porter v. Clarke*, 852 F.3d 358, 363–64 (4th Cir. 2017).

The Upright Defendants continue to file cases in this Court under the existing business model, and the manner in which the Rule 2016(b) disclosures are prepared and filed is a recurring issue. To say that the Court cannot review their practices because in the two instances currently before the Court they paid the attorney's fees back to the debtors before the Court had a chance to rule on the adequacy of their disclosures would gut the "voluntary cessation" rule as described above. Moreover, in line with *Knox* above, the UST has asked the Court in each Complaint to take such other action as the Court deems necessary to deter such misconduct and similar schemes in the future," and the Court has that discretion under Section 105(a). There

38

remains a "concrete interest . . . in the outcome of this litigation," and the Court finds Counts I and II of both Complaints, and Count III of the Williams Complaint, are not moot.[48]

## B. **LSC as a law firm and the status of Delafield and Morgan as partners**

The UST contends that cancellation of the retention agreements and disgorgement of attorney's fees are appropriate in this case against Delafield, Morgan, Upright, and LSC because they each failed to satisfy their disclosure obligations under the Bankruptcy Code and Rules. UST Brief at 39. The UST contends that the Rule 2016 certifications in these cases are inaccurate and misleading.[49]  The UST asserts that Rule 2016(b) requires the disclosure of the sharing of compensation between entities while not requiring the disclosure of sharing within a firm. Here, the UST argues that LSC does not fit the definition of a law firm and neither Morgan nor Delafield qualify as a bona fide partner of LSC for purposes of Rule 2016(b). Therefore, LSC's undisclosed sharing of fees with Morgan and Delafield is improper. *Id.* at 41. Bluntly stated, the UST characterizes the collective Upright entities, with Chern, Scanlan, and Allen at LSC's helm, as nothing more than a "boiler room and mere forwarder of legal business," and a "call center employing sales people and hard sell tactics to collect money" from, among others, Virginia residents. *Id.* at 42. The UST argues (1) that LSC is not properly registered with the Virginia State Bar, (2) that it is not organized to deliver legal services to Virginia residents, (3)

---

[48] As to Count II of the Complaints, the additional question arises as to whom should the funds should be disgorged? Section 329(b) provides that the court may order the return of any such payment to "(1) the estate, if the property transferred— (A) would have been property of the estate; or (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or (2) the entity that made such payment." 11 U.S.C. § 329(b). This is an open question for the Court, not the Upright Defendants, to decide.

[49] Fed. R. Bankr. P. 2016(b) provides as follows: ". . . (b) Disclosure of Compensation Paid or Promised to Attorney for Debtor. Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed."

that it encourages the unauthorized practice of law, (4) that there is an inability to perform meaningful conflicts checks, and (5) that a real law firm would have reasonable oversight procedures. *Id.* at 42-43. Further, the UST contends that Scanlan is a secret owner of the firm, disqualifying it as a law firm.

The UST then argues that even if LSC could be considered a law firm, Morgan, Delafield and Upright Law, LLC, the Virginia entity, are not *bona fide* partners in LSC. Even though Morgan and Delafield testified that they thought they were "partners" in LSC, the UST contends the evidence shows they were not. As examples of this lack of *bona fides*, Morgan and Delafield have no legal access to partnership documents that the law permits them to have, and the partnership agreements expressly provide that they have no right to participate in the management of the firm. The local partners are generally prohibited from collecting money from clients and the agreements attempt to prohibit local partners from soliciting clients upon disassociation from the firm. That the local partners receive no portion of the fees from files that were closed without a case being filed is another factor the UST relies upon. *Id.* at 44.

LSC, in turn, contends that LSC and Upright, with Delafield and Morgan as local partners, are very much a true law firm, both in form and substance. LSC contends that it is sufficient for an attorney to simply be a "member," "partner," or "regular associate," which are all terms Section 101 of the Bankruptcy Code leaves undefined. 11 U.S.C. § 101. Thus, LSC contends courts apply this section in a practical manner, recognizing that different law firms have varying types of structures and varying relationships with their attorneys. LSC contends that Delafield and Morgan have a true partnership relationship with Upright. It enters into partnership agreements with its local partners. They are provided with malpractice insurance. The local partners, albeit while maintaining their separate law practices, hold themselves out to

40

the general public with the title, style and attribute of a "partner," and the partners are supposed

to take reasonable steps to advise their clients of their affiliation with Upright. Moreover,

Morgan and Delafield share in the firm's revenues and receive a Schedule K-1 to report their

Upright-related income, not a W-2 nor a Form 1099.[50]  Chern also testified that the local partners

participate in partnership meetings with him, and they are invited to an annual partnership

meeting in Chicago. They also receive regular newsletters and have direct communication with

him to share concerns and to discuss issues with the firm and clients.

In *Futreal*, this Court observed – addressing Prince Law's ill-fated foray into Virginia –

that these multi-jurisdictional local partner arrangements "are often nothing more than disguised

independent contractor arrangements designed to increase revenue streams by attempting to

evade the fee splitting prohibitions in the Bankruptcy Code and Bankruptcy Rules." *Futreal*,

2016 Bankr. Lexis 3974, at \*42.[51]  Further, in *Banner*, addressing the Volks Anwalt firm and its

managing partner Jessica McClean, Judge Beyer observed:

> While Volks Anwalt has "partners" other than McClean, they have no voting
> rights, own only nominal shares in the firm, and have no authority, control, or
> input over the operations and management of Volks Anwalt. The only authority
> that these "partners" may have is with respect to case management of their
> assigned cases in their localities. McClean controls all matters related to the
> business of Volks Anwalt, including overseeing all financial, marketing, and
> human resources activities.

---

[50] In 2016, LSC filed a composite tax return in Virginia, and the record reflects the Schedule K-1's received by
Morgan and Delafield were from LSC, not Upright Law, LLC, a Virginia limited liability company. Upright Ex. P5,
p. 39. No Schedule K-1 was provided from the Virginia entity, which is the entity with which Morgan and Delafield
had partnership agreements.

[51] Another "multi-jurisdictional" firm using a local attorney arrangement, Volks Anwalt, was barred from practicing
in the Western District of Virginia under an agreement with the UST for a period of three years. *In re Glover*, No.
15-61476 (Bankr. W.D. Va. Dec. 15, 2015). Volks Anwalt was also sanctioned by the Western District of North
Carolina and disbarred from that court for a period of five years. *In re Banner*, No. 15-31761, 2016 WL 3251886
(Bankr. W.D. N.C. June 2, 2016). The firm was also sanctioned in Hawaii, as was its local counsel. *In re
Hanawahine*, 577 B.R. 573 (Bankr. D. Hawaii 2017) (disciplining Volks Anwalt and its local partner for abandoning
client).

*Banner*, at *3.  The Court in *Banner* also observed that the Volks Anwalt local "partners," in her

estimation, "were not legitimate partners" in the firm.  *Id*. at *9, n.39.

While the Upright/LSC firm bears many similarities with that of Prince Law and Volks

Anwalt, including the observations of Judge Beyer quoted above, it is a much more sophisticated

and structured operation, perhaps because it is formed and operated by individuals, albeit self-

described, experienced in law firm operations and internet marketing.  Without limitation, efforts

have been made to register the Virginia entity with the Virginia State Bar, as well as to qualify it

to do business in Virginia and elsewhere.[52]  The firm shares client information with its local

partners through its SalesForce case management software system, such that Chicago and the

local offices can work on files together, and the local partners are given significant involvement

in the preparation, filing and management of the clients' cases, more so now than when Upright

first started.  LSC/Upright has a conflicts check system whereby it can run conflicts against its

local partners' Upright clients, although it cannot run conflicts checks against those local

partners' clients in their separate law practices.  For example, neither LSC/Upright nor Morgan

can check their client database against Delafield's non-Upright client database.  The local

partners can check their non-Upright client databases against the larger Upright client database,

and based on Chern's testimony, this has not presented a problem in day-to-day operations, since

the local partners rarely represent creditors.  The Court is deeply disturbed by the lack of

effective oversight of its sales people and methods used by LSC/Upright to sell its product,

which will be addressed in more detail to follow, as well as the way it provides services and

---

[52] The Court acknowledges that, for a period of time, Upright was providing legal services in Virginia and in this Court without being properly qualified to do so.  The Court further understands and appreciates the UST's position that the registration was both improperly prepared and untimely filed, and that the registration on file is for Upright Law, the Virginia entity, and not LSC.  The Virginia State Bar has taken no action against any of the collective Upright entities for their registration deficiencies.  Chern, Tr. 206, Day 3.  At this point, the Court will leave the consequences of those deficiencies, if any, to the proper State authorities.

utilizes Virginia lawyers to do so in this District. However, it cannot say LSC is not a law firm.[53]

Under the Virginia Rules of Professional Conduct, "firm," or "law firm" "denotes a professional entity, public or private, organized to deliver legal services, or a legal department of a corporation or other organization." Va. R. Prof'l Conduct, Preamble, Terminology. A comment to Rule 1.10 provides as follows:

> Whether two or more lawyers constitute a firm as defined in the Terminology section can depend on the specific facts. For example, two practitioners who share office space and occasionally consult or assist each other ordinarily would not be regarded as constituting a firm. *However, if they present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm, they should be regarded as a firm for the purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm, as is the fact that they have mutual access to information concerning the clients they serve.* Furthermore, it is relevant in doubtful cases to consider the underlying purpose of the Rule that is involved. A group of lawyers could be regarded as a firm for purposes of the Rule that the same lawyer should not represent opposing parties in litigation, while it might not be so regarded for purposes of the Rule that information acquired by one lawyer is attributed to the other.

Va. R. Prof'l Conduct, 1.10 Cmt. [1] (emphasis added).

The Court recognizes that compliance with both Section 329 and Rule 2016(b) are questions of federal, not state, law. But, the comment above is not inconsistent with Federal Rules of Bankruptcy Procedure 9001(6) and (10). Those provisions find that for the purposes of the Bankruptcy Rules, "Firm" includes "a partnership or professional corporation of attorneys or accountants", and "Regular associate" means "any attorney regularly employed by, associated with, or counsel to an individual or firm." Fed. R. Bankr. P. 9001(6), (10). Although raised in a

---

[53] Scanlan's role in LSC is concerning to the Court as well. It is clear to the Court from the undercurrents at trial that while Scanlan is not one of the technical, legal owners of LSC, his hand is never far from the wheel. Moreover, the federal tax return admitted as Upright Ex. P5 reflects substantial portions of LSC's legal services revenues are channeled to both Royce Marketing and Mighty Legal for marketing and employee leasing services, which flow down to Justiva and ultimately to Scanlan.

somewhat different context, the Court appreciates Judge Chapman's observation in *In re GSC*

*Grp., Inc.*, 502 B.R. 673 (Bankr. S.D. N.Y. 2013), that:

> [m]uch has changed in the way law firms are organized since the founding of the earliest American firms in New York in the late eighteenth century. The complex, multinational structures of today's law firms would hardly be recognizable to the general partners of these early firms. Law firms today, as well as accounting and financial advisory firms, are comprised of partnerships, limited liability partnerships, professional corporations, limited liability companies—and combinations thereof. . . . Moreover, the titles and status afforded lawyers who practice in such firms have also evolved, along with the perquisites associated therewith; twenty-first century law firms include equity partners, non-equity partners, contract partners, shareholders, associates, contract associates, counsel, of counsel, senior counsel, and the list goes on. . . . Gone are the days of the professional universe being neatly divided into members and associates—and lawyers and accountants—as contemplated by the Code and the Rules.

*Id.* at 735, n.227.[54]

Mindful of the above, the Court turns to Delafield's and Morgan's relationship with

LSC/Upright. Although styled as "limited partners" with no rights to management of the firm,

the Court takes a more holistic approach. Looking to substance over form with regard to the

partnership agreements and the record in this case, including the method and manner of

Delafield's and Morgan's interactions with LSC in Chicago, the Court is satisfied that both

Morgan and Delafield are "regularly associated with" or "counsel to" the "firm," of which the

local Virginia LLC in which Delafield and Morgan are limited partners is a component part.

Thus, the Rule 2016(b) disclosures are not deficient on the basis that LSC/Upright is not a law

firm and that Delafield's and Morgan's relationships with it are impermissible. The Court finds

that the statements in the Rule 2016(b) disclosures by Delafield and Morgan that "I have not

agreed to share the above-disclosed compensation with any other persons unless they are

members and associates of my law firm" are not actionable in these cases. Disgorgement and

---

[54] The Court wrestled with this conclusion, especially given the admonition against treating bankruptcy cases as a "matter of traffic." *See In re Worldwide Direct, Inc.*, 316 B.R. 637, 646 (D. Del. 2004).

cancellation of the retention agreements between LSC/Upright, the Williamses, and Scott will

not be ordered on that basis.

### C. Additional Rule 2016(b) and engagement deficiencies

Chern testified that the Rule 2016(b) disclosures were and still are prepared in Chicago.

Chern, Tr. 197, Day 3.[55] The UST argues that from May 12, 2015, when Fenner sent Chern the

email outlining the operation of the "New Car Custody Program," LSC knew that Fenner &

Associates would be the source of payments for those clients participating in the Sperro

Program. Even though Fenner & Associates was controlled by the same person as Sperro,

Fenner & Associates actually wrote the checks to LSC/Upright. Nevertheless, when the Rule

2016(b) disclosures were filed for the Williamses and Scott, they failed to disclose that Fenner &

Associates paid the fee instead of Sperro. To date, the UST points out no amended Rule 2016(b)

disclosure has been filed in either case correcting the actual remitter of the fees.

The UST also complains that the engagement agreements between Upright and the

Williamses and Scott contained misrepresentations and were also unclear or inaccurate.[56]

Among the UST's contentions are that the engagement agreements misrepresented the local

attorneys' true hourly rates. The Williamses' and Scott's retainer agreements appear to be form

agreements used in the Western District of Virginia and elsewhere, and the hourly rate

substantially exceeds the market rate for such services in this District. It appears the agreements

specified rates of $395.00 per hour regardless of the fees the attorney actually charged, although

Morgan's time records did specify $395.00 an hour in Scott's case.[57] Further, in violation of

---

[55] Delafield at one point testified he prepared the Williamses' 2016(b) disclosure. That does not appear to have been the case. UST Ex. 23, Tr. p. 208.
[56] For example, the Williamses' engagement agreement indicated amendments to schedules were included in the flat fee, while in another portion of the same agreement, those services were excluded. UST Ex. 3-24, ¶¶ 8(f), 9(h).
[57] Delafield's true local rate on the Williamses' file appears to have been $200.00 per hour. UST Ex. 3-23. In Scott's case, every attorney involved appears to have billed $395.00 per hour, regardless of whether they were an

Virginia ethics rules, the engagement agreements contained provisions that funds paid were earned when paid.[58] The UST further contends that in Scott's case, the Rule 2016(b) disclosure reflects that Morgan and Upright agreed to accept $1,500.00 for legal services initially, but were paid $1,650.00 and the disclosure did not reflect the $100.00 that Scott paid.

As to the Williamses, the UST contends that a "debt relief agency" is required to give an assisted person an executed written contract within 5 business days of first offering bankruptcy assistance to the assisted person. 11 U.S.C. § 528(a)(1). The written contract is required to explain "clearly and conspicuously - (A) the services such agency will provide to such assisted person; and (B) the fees or charges for such services, and the terms of payment." *Id.* The debt relief agency is also required to give the assisted person a "copy of the fully executed and completed contract." 11 U.S.C. § 528(a)(2). "Any contract for bankruptcy assistance between a debt relief agency and an assisted person that does not comply with the material requirements of this section, section 527, or section 528 shall be void. . . ." 11 U.S.C. § 526(c)(1).[59]

LSC, Upright, Delafield and Morgan stipulated they are "debt relief agencies." Stip. ¶ 10. The Williamses and Scott are "assisted persons" as defined in the Code. LSC/Upright clearly provided "bankruptcy assistance" to the Williamses well before they received the written

---

associate or partner. The veracity of Upright's time records for Scott's case are questionable to the Court. See pp. 27-28, *supra*.

[58] It appears that from 2014 through March 2016, attorney's fees were placed directly into LSC's Illinois general operating account or LSC's Virginia operating account. In response to an Interrogatory, LSC stated, in part, as follows: "LSC states the following that it is currently in compliance with Virginia's IOLTA rules. However, LSC and Upright initially misinterpreted the Virginia IOLTA Rules and found out this was the case in March 2016. At that time, they immediately began depositing all new Virginia client funds into its Virginia, IOLTA account and began an audit of payments received and earned from its Virginia clients. After completion of the audit and determining the proper amounts that should be in (and or replenished into) the Virginia IOLTA account, the IOLTA account was properly replenished. This process was completed in October 2016. . . ." UST Ex. 2, p. 4.

[59] These are but a fraction of the UST's complaints about Upright's engagement agreements and retention procedures in these cases. *Cf. Lyda v. City of Detroit (In re City of Detroit)*, No. 13-53846, 2014 WL 6474081, at *7 (Bankr. E.D. Mich. Nov. 19, 2014) ("These allegations have an 'everything but the kitchen sink' quality that makes them challenging to parse through."). In the future, the Court trusts the UST will take a more focused approach on such matters.

contract from Upright.[60]  In fact, and without limitation in terms of bankruptcy assistance, it

appears their car was picked up on Upright's Sperro referral long before they ever saw a written

contract that fell within the scope of Section 528(a).[61]  Without addressing each and every UST

alleged violation of Section 528(a) as to the Williamses, it is clear from the record that Upright

violated Section 528(a) as to the Williamses based on the timing of the delivery of the written

agreement.  The contract between Upright and the Williamses is declared void pursuant to Count

III of the Williams Complaint.

Further placing the Williamses and Ms. Scott into the Sperro Program is a sufficient basis

to declare Upright's fee to be unreasonable in both the Williams and Scott cases under Section

329(b).  What these individuals have had to endure as a result of the actions of LSC, Chern,

Upright, Delafield and Morgan is unconscionable.  Section 329(b) provides that the court "may

cancel any such agreement, *or* order the return of any such payment to the extent excessive, to –

(1) the estate, if the property transferred – (A) would have been property of the estate; or (B) was

to be paid by or on behalf of the debtor under chapter 11, 12, or 13 of this title; or (2) the entity

that made such payment."  11 U.S.C. § 329(b) (emphasis added).  Here, the Court sees little

point in cancelling the agreements between Upright, the Williamses, and Scott. The Williamses'

agreement has already been declared void under Section 526(c)(2) for violating Section 528(a).

Scott and the Williamses have received their discharges and moved on with their lives.  The

pendency of these adversary proceedings is what is keeping their cases from being closed.

---

[60] "The term 'bankruptcy assistance' means any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title."  11 U.S.C. § 101(4A).

[61] UST Ex. 3-5, p. 6 reflects the written retainer agreement was "completed" for the Williamses on September 30, 2015.  The agreement was signed October 16, 2015.  UST Ex. 3-24.  No fully executed contract signed by Upright or Delafield was introduced.  The Williamses' first contact with Upright at which time "bankruptcy assistance" was provided was on August 27, 2015.

The Court acknowledges that after this litigation ensued, Upright on its own paid the

Williamses and Scott funds received on their behalf – for the most part. Upright is still holding

approximately $100.00 in excess funds on Scott's behalf.[62]  However, the Court believes that all

funds received by Upright in these cases should be remitted back to the debtors' estates. The

money Fenner & Associates paid to Upright on behalf of the Williamses and Scott in connection

with the Sperro Program would not necessarily have been estate property, because it does not

appear that the funds paid were traceable to proceeds of the sale of the debtors' vehicles. The

funds were paid to Upright well before the vehicles were sold. Nevertheless, the legal fees were

paid to Upright as a *quid pro quo* for the surrender of what would have been estate property,

albeit property subject to a lien that the trustee would likely have abandoned (assuming

perfection of the lender's security documents). This nexus to what would have been estate

property is sufficient for the Court to conclude that the Chapter 7 trustees ought to have the

opportunity to consider the disposition of the funds returned by Upright, as small as the dollar

amounts may be, and who may be entitled to those funds. That Upright jumped the gun and paid

funds to the Williamses and Scott voluntarily after litigation commenced is a loss Upright will

have to bear. The Court will grant the UST's requests in both Counts I and II of the Scott and

Williams Complaints that the fees received by Upright be delivered to the estates in those cases.

The UST's request that fee agreements be cancelled is denied.

---

[62] It appears that Upright received $1,750.00 in attorney's fees on Scott's case. Apart from filing fees, Upright
received $1,650.00 from Fenner & Associates for the Sperro Program, and $100.00 from Scott. Upright refunded
Scott $100.00 on her debit card on June 8, 2016, then it sent her an additional $1,550.00 on July 28, 2016.   UST Ex.
4-14.

IV.     **Williams Count IV and Scott Count III – Injunction under 11 U.S.C. §
        526(c)(5)(A)**

In the above referenced Counts, the UST seeks injunctions against LSC, Upright,

Delafield, and Morgan to enjoin them "from violating 11 U.S.C. § 526." Williams, Complaint ¶

100; Scott, Complaint, ¶ 96. The Court has already found that LSC is a law firm and that the

Rule 2016(b) disclosures are not deficient on that basis alone.

The Court is aware of another recent decision, *In re Bishop*, involving Upright and the

UST, where some, but not all, of the same issues in this case were raised. [63] *See In re Bishop*,

578 B.R. 158 (Bankr. W.D. N.Y. 2017). In that case, as here, the UST alleged the individual

local attorney and the Upright Defendants "have engaged in a clear and consistent pattern of

filing false and misleading disclosures of compensation in other Upright Cases." *Id.* at 166. The

UST also sought to have the Court enjoin the defendants "from violating 11 U.S.C. § 526." *Id.*

The *Bishop* court observed that, while the injunction request tracked the language of 11

U.S.C. § 526(c)(5)(A), "'when Congress authorizes injunctive relief, it implicitly requires that

the traditional requirements for an injunction be met in addition to any elements explicitly

specified in the statute.'" *Id.* at 166 (citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092,

1098 (11th Cir. 2004)). The Court went on to observe that an order granting an injunction must

meet the specific requirements of Federal Rule of Civil Procedure 65, and as the Second Circuit

has noted, "'an injunction must be more specific than a simple command that the defendant obey

the law.'" *Bishop*, 578 B.R. at 199 (citing *Peregrine Myanmar v. Segal*, 89 F.3d 41, 51 (2d Cir.

1996)).[64] As stated in *Bishop*, an injunction simply to order the defendants to obey the law and

---

[63] Neither the New Car Custody Program, Sperro, nor Fenner & Associates appeared to be implicated in *Bishop*.
[64] The Fourth Circuit acknowledged this argument in *U.S. S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 255 (4th Cir.
2009), observing that "Federal Rule of Civil Procedure 65(d) requires that injunctions 'describe in reasonable detail .
. . the act or acts restrained or required,' and several circuits have relied on Rule 65(d) to require that injunctions do
more than instruct a defendant to 'obey the law.' *See, e.g., Burton v. City of Belle Glade,* 178 F.3d 1175, 1201 (11th

not violate Section 526 would be difficult to police and run afoul of Rule 65. Accordingly,

Williams Count IV and Scott Count III will be dismissed.[65]

### V.   Williams Count VI and Scott Count V – Section 105(a) and the Court's Inherent Authority

"A federal court has an inherent power 'to control admission to its bar and to discipline

attorneys who appear before it.'" *Paciocco*, 2015 WL 5178036 (citing *In re Parker*, No.

3:14cv241, 2014 WL 4809844, at *5 (E.D. Va. Sept. 26, 2014) (quoting *Chambers v. NASCO,*

*Inc.*, 501 U.S. 32, 43 (1991))). "This inherent power extends to bankruptcy courts and 'includes

the power to suspend or disbar attorneys from practicing before the court.'" *Paciocco*, at *1

(citing *Williams v. Lynch (In re Lewis)*, No. 141881, 2015 WL 3561277, at *2 (4th Cir. Jun. 9,

2015) (citing *In re Snyder*, 472 U.S. 634, 643, 105 S. Ct. 2874 (1985))). Further, Section 105(a)

authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary to carry

out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *In re Circle T Pipeline*, No.

11-70556, 2011 WL 9688240, at *12 (Bankr. W.D. Va. April 27, 2011). Two years ago,

discussing the "national law firm" business model and the use of local, limited partners, this

Court made the following observation:

> These cases raise several questions as to who, if anybody, has oversight authority
> over these arrangements: Is it the state disciplinary authority where the law firm
> retains local counsel, or is it the authority where the law firm is physically
> located? If the former, when the ultimate sanction is to take a license, what power
> does that bar have to discipline attorneys who have no license to begin with? If
> the latter, does the bar have power to sanction local attorneys for actions that may
> have occurred in cases conducted in another state? Who has disciplinary and

---

Cir. 1999); *Payne v. Travenol Labs., Inc.*, 565 F.2d 895, 897–98 (5th Cir.1978)." The Fourth Circuit did not take up this issue, however, as it was raised for the first time on appeal.

[65] The UST should know that this Court also agrees with the caution in *Bishop* about the use of "shotgun" pleadings. In *Bishop*, Judge Warren referred to *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1318–26 (11th Cir. 2015), which categorized the 4 types of shotgun pleadings. "[T]he most common type—by a long shot—is a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint)." *Bishop*, 578 B.R. at 167–68. The Complaints in this case suffer from a virtually identical affliction.

ethical authority over the client's fees and the attorney's trust account when the fees are paid out of state and the local attorney doing the work has no oversight or direct access to them? Do disciplinary authorities in multiple states have the ability to coordinate their efforts?

*Futreal*, 2016 Bankr. LEXIS 3974, at *41. As this case further demonstrates, the issues are complex, recurring, and multi-jurisdictional. It may well be that the federal courts in which the practices most often arise may be the most able and efficient places to draw lines.

As stated in *In re Burton*, 442 B.R. 421, 467 (Bankr. W.D. N.C. 2009), "[a] court exercises the authority to sanction attorneys with due restraint. When disciplining an attorney, the court must fashion an appropriate sanction without overreaching." (citing *Byrd v. Hopson,* 108 Fed.Appx. 749, 756 (4th Cir. 2004)). Further, *Burton* held that "[c]ourts should impose the minimum sanction necessary to both protect the public and deter future misconduct. . . . To this effect, courts are inclined to discipline a first offense with a lesser sanction and increase the severity of the discipline for any subsequent infractions, while taking into account previous failed attempts to discipline the attorney." *Burton,* at 467. In this case, the Sperro/New Car Custody Program was a scam from the start. Despite Chern's protestations to the contrary, the Court believes he was well aware that cars were being towed out of state as early as June 18, 2015, or even earlier. UST Ex. 35-55; UST Ex. 35-37. The only purpose for doing so was to prime the secured lender's lien under more favorable state law towing and garagemen's liens, while running up exorbitant fees, and it benefitted Upright by getting their attorney's fees paid faster. As can be seen by a multitude of exhibits, including the Sales Playbook and scripts, the leadership of Upright constantly had its concerns on cash flow.[66] The fact that this Program was

---

[66] Chern testified in part that, with regard to Upright's usage of the Playbook and its aggressive sales techniques, ". . . we train our client consultants to compete against other lawyers for the representation of the clients. Why they should use our services verses another attorney's services." Chern Tr. 12-13, Day 4. Further, these techniques are to "motivate a consumer to take an action to actually start advancing their own best interest which sometimes they just

51

offered or suggested to debtors before they even had the chance to speak to an attorney makes it all the more egregious. Chern testified as follows:

> Remember, we never made participating in the Sperro program a condition of working with Upright Law. In other words, we said to the debtor, "if you are interested in using this program, go ahead. But if you decide you don't want to use the program, that's fine too but you're responsible for the payment of your own legal fees."

Chern, Tr. 106, Day 3. Making this proposal to cash-strapped debtors was essentially offering them a Hobson's choice – one the debtors had to make without legal advice – all while Upright was offering its services under the guise of helping them make the proper decisions to reach their "financial independence." Upright preyed upon some of the most vulnerable in our society – as the Williamses demonstrated – while they were under great stress. The Williamses were only 20 and 21 years old, with two children, when the Sperro New Car Custody Program was proposed to them. UST Ex. 3-20, pp. 3-4; UST Ex. 3-15, p. 72. Many of the debtors have had to take time off from work to either appear in Court or be deposed in this case, and the anxiety placed upon them permeates both the testimony and written communications. The debtors were left to question if they did anything wrong, as well as the consequences they might face, without proper guidance and assurance.

Of no lesser import is the impact upon an untold number of vehicle creditors.[67] The record reflects that 217 Upright clients participated in the New Car Custody Program nationally, but how many different creditors lost their collateral after being caught up in it is not readily clear, nor is the dollar value of collateral converted or the amount of funds Sperro and/or Fenner & Associates ultimately pocketed. The Court does know that Upright received an amount of not

---

don't act in the best self-interest." *Id.* at 14. The Court found Chern's overall emphasis on sales and profit to be far more credible than his goals of helping consumers execute on decisions they had already made in their own minds.
[67] Chern testified that he felt remorse for the Sperro Program, that it was a "horrible" mistake, and that he felt "horrible" that he put his partners and their professional reputations at risk, acknowledging that there were "red flags that I should have given more credence to." Chern, Tr. 119-120, 278, Day 3.

less than $333,545.00 in fees from Fenner/Sperro in payment of legal fees. This is exclusive of

filing fees. As shown by the language of the security agreements with the Williamses' and

Scott's lenders, hiding and intentionally removing their collateral from Virginia and facilitating

the imposition of state law liens against it was contrary to the debtors' contractual obligations to

their lenders.[68] There is no credible evidence that Chern or anybody at Upright gave serious

thought or concern to this.

Chern's testimony about being intrigued about Fenner's pitch that the New Car Custody

Program could be a benefit to Upright's customers, taking the burdens of maintaining and

surrendering the collateral off their shoulders, was not credible, nor was his belief that he was

really trying to help his clients. Chern, Tr. 278, Day 3. On May 21, 2015, Chern even inquired

if there was a way for a consumer to waive the 30-day hold requirement of Indiana law to see if

the mechanic's lien could attach sooner. UST Ex. 35-37. Moreover, Chern was also angling for

a separate $150.00 fee for his separate "marketing company." UST Ex. 35-54. As the legal fees

and filing fees were running on average between $1,800 to $2,000, Chern, clearly a financially

astute businessman, had to know that Fenner and Sperro had to charge more than that to make a

profit. Fenner's initial pitch email stated as much.[69] Two former Upright clients, Russell

McGuire and Regina White, testified that their cars were sold with Sperro having incurred

charges of between $4,500 and $5,000. McGuire, White Tr. 236, 249, Day 1. It was also not

credible that Chern could have believed that the New Car Custody Program was some kind of a

---

[68] In Virginia, it may also be a crime. Va. Code § 18.2-115 provides, in part, as follows: "Whenever any person is in possession of any personal property, including motor vehicles or farm products, in any capacity, the title or ownership of which he has agreed in writing shall be or remain in another, or on which he has given a lien, and such person so in possession shall fraudulently sell, pledge, pawn or remove such property from the premises where it has been agreed that it shall remain, and refuse to disclose the location thereof, or otherwise dispose of the property or fraudulently remove the same from the Commonwealth, without the written consent of the owner or lienor or the person in whom the title is, or, if such writing be a deed of trust, without the written consent of the trustee or beneficiary in such deed of trust, he shall be deemed guilty of the larceny thereof."

[69] See quoted language in UST Ex. 35-18, *supra* p. 18.

loss-leader for Fenner, or that Fenner could somehow make his auction services attractive to the

vehicle lenders after Fenner towed their collateral hundreds of miles to states where their

financing liens could be primed in violation of contractual covenants with their borrowers.[70]

Despite red flags of being a "scam," including one local partner questioning it as such on June

18, 2015,[71] Chern went forward with the rollout on June 18, 2015.[72]

Considering (1) the hard sell tactics encouraged on its sales people, (2) the transcripts of

the actual recordings of the calls with clients, (3) the lack of supervision and control over its

salespeople in connection with the unauthorized practice of law, due in no small part to the

commission and sales structure imposed upon them, (4) the focus on cash flow over professional

responsibility, and (5) the participation in the Sperro Program and the record as a whole,

including Upright's efforts to get the Williamses and Scott to assert the attorney-client privilege

in a thinly-veiled attempt to cover its own tracks, this Court believes that the Upright Defendants

---

[70] This point is borne out by a recent opinion of the Indiana Court Appeals, after Sperro was sued by Ford Motor Credit Company over the "Sperro Plan." In *Sperro LLC v. Ford Motor Credit Co., LLC*, 64 N.E.3d 235 (Ind. App. 2016), the Court observed that "[u]nder the Sperro Plan, Sperro established contacts with numerous consumer bankruptcy attorneys throughout the United States, who would notify Sperro when a prospective bankruptcy client had a financed vehicle that he or she could no longer afford to make the payments on. Although such vehicles would normally be voluntarily surrendered to the secured creditor, Sperro would offer to pay the client's bankruptcy legal fees in exchange for the client's agreement to have the vehicle towed to Indiana and stored pursuant to a Transporting and Storage Authorization Agreement ('TSAA')." *Id.* at 239-240. Further, "Sperro transported the Vehicles from New Mexico, California, Louisiana, and Arizona to its Storage Yards in Indianapolis." *Id.* The Indiana Court of Appeals upheld, among other things, a trial court injunction finding in that "Sperro's business was to transport and store collateral, and therefore Fenner had to know that all the vehicles surrendered to Sperro pursuant to the TSSA's have been financed and are subject to the liens. Fenner's business experience supports the trial court's conclusions that he had or should have had general knowledge that the Borrowers purchased the Vehicles pursuant to retail installment contracts and the provisions generally included therein. Accordingly, the trial court did not err in concluding that Sperro and Fenner intentionally induced the breach of the Installment Contracts between the Borrowers and FMCC or proceeded with reckless disregard of the contractual relationship between the Borrowers and FMCC. Therefore, we affirm the trial court in all respects." *Id.* at 250.

[71] In a June 8, 2015 email from Allen to Chern, Allen stated: "It might be time to send an email to the partners about the program. We just had a client who surrendered his car, then talked to the partner for the compliance call, where the partner attorney told our client it sounded like a scam. Then of course the client calls in freaking out." UST Ex. 35-47.

[72] Chern testified that he tried to send notices to secured lenders earlier than Fenner wanted, but in the Williams case, that was sent to the wrong creditor at the wrong address. That was effectively no notice at all, as GCB's attorney showed up at the Williamses' 341 meeting to inquire as to the status of the car. Moreover, by the time the notices in the record were sent, the vehicles were well on their way to, if not already in, Indiana at $1.50 a mile, plus a $75 loading fee, and $45 per day storage. UST Ex. 35-53. The distance from the Williamses' residence in Saltville, Virginia to the Sperro lot in Indiana is approximately 420 miles one way per Google driving directions.

have acted in bad faith and the privileges of LSC, Upright Law, Chern, and Allen to file or

conduct cases, directly or indirectly, in the Western District of Virginia shall be revoked for a

period of five (5) years.[73]  This includes any firm that that LSC, Upright Law, Allen, or Chern,

directly or indirectly, have an ownership interest in or control over.  Further, LSC, Upright,

Chern, Allen, Scanlan and Sperro shall be fined collectively the sum of $250,000.00.[74]  Chern

shall be separately and personally fined the sum of $50,000.00 for his participation in and

leadership of the Sperro scheme.  Given LSC's financial resources and revenues in particular, as

reflected by its tax returns and evidence of receipts from residents of the Western District of

Virginia, these sums are appropriate in an effort to deter future misconduct.  A lesser sanction

would not be more appropriate.[75]  These fines are to be paid to the Office of the United States

Trustee within thirty (30) days of the Court's Order becoming final and unappealable.

Delafield and Morgan bear responsibility for their actions as well.  Delafield did do some

things correctly: He met with his clients, he witnessed their signatures on the petition and

schedules, and he went over the petition and schedules with them and explained things as an

attorney should.[76]  However, he also did some things incorrectly, like not acting appropriately

---

[73] The Court uses the word "revoked" instead of "suspended" for a reason.  Any person or entity whose privileges are revoked by this Court's Order will have to reapply for privileges to practice at the end of the revocation period, at which time the Court will consider their application as well as their compliance with this Opinion and the Order of revocation.  Readmission will not be automatic.

[74] UST Ex. 35-33 is a direct reach out from Scanlan to Fenner in connection with the Sperro Program, and the Court believes that Scanlan was well aware of the Sperro Program.  Further, as LSC's internet marketing expert, his fingerprints appear to be all over the hard sell tactics used by LSC/Upright.  Scanlan, Tr. 102-103, Day 4.  In harmony with *Bishop*, whether the structure of LSC/Upright and Scanlan's role in it pass muster under Illinois law is a question the Court will leave to appropriate Illinois authorities.

[75] In 2016, LSC paid over 68% of its substantial gross revenues to Royce Marketing (Advertising) and Mighty Legal (Leased Payroll), captive companies of Justiva, for which it took deductions on Schedule 4 of its federal tax return.  Upright Ex. P5; Scanlan, Tr. 114-16, Day 4.  The Court also considered Chern's testimony that through trial LSC has refunded approximately $100,000.00 in legal fees earned from Sperro and incurred over $1,000,000.00 in legal expenses related to its involvement in the Sperro Program.  Chern, Tr. 275, Day 3.  Even considering that testimony, the Court believes its sanction to be appropriate.  Chern, Tr. 275-76, Day 3.  LSC is well able to handle this payment.

[76] The Court has no qualms about Delafield meeting with clients or witnessing signatures over Skype.  This district is approximately 400 miles long from Winchester to the Cumberland Gap.  Appropriate accommodations can be made with the proper use of technology.  However, simple telephone calls are unacceptable.

when it appeared he had a conflict of interest when the Sperro Program came to light, and also

filing amendments to the petition without obtaining a wet signature, much less getting the

clients' permission.  Although not under oath, Delafield was an officer of the Court and less than

forthcoming at the Williamses' 341 meeting.

At the 341 meeting, Delafield professed ignorance as to why Sperro paid the attorney's

fees for the Williamses in their case.  Clearly backpedaling, he said, "I don't know" and a "senior

attorney at Upright can fill you in on the details.  I can't."  UST Ex. 3-2.  He knew full well what

the Sperro Program was and how it worked.[77]  Delafield knew as early as December 2015, as the

Williamses had told him, that the car had been used to pay their fees.  He also admitted in his

Answer to the Complaint that he received the June 18, 2015 email about the New Car Custody

Program from Chern.

Delafield fumbled even more fundamental responsibilities.  A lawyer with primary

responsibility for a client's legal matter is under a duty to know how his client's file is being

handled and cannot simply claim ignorance of another's misconduct.  *Cf. Banner v. Cohen, Estis

and Assoc., LLP (In re Balco Equities, Ltd., Inc.)*, 345 B.R. 87 (Bankr. S.D. N.Y. 2006)

(discussing New York Rules of Professional Responsibility).  This was Delafield's case, and he

was the responsible attorney before this Court.  The actions leading up to its filing, the filing

itself, and the conduct of the case fall to him.  Moreover, Virginia Rule of Professional Conduct

5.1(c), applicable to attorneys practicing in this Court, provides as follows:

> (c) A lawyer shall be responsible for another lawyer's violation of the Rules of
> Professional Conduct if: (1) the lawyer orders or, with knowledge of the specific
> conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has
> managerial authority in the law firm in which the other lawyer practices, or has
> direct supervisory authority over the other lawyer, and knows of the conduct at a

---

[77] Delafield's December 11, 2015 time entry stated, "Darren called Chicago and asked for additional information regarding Sperro."  UST Ex. 3-23, p. 4.

time when its consequences can be avoided or mitigated but fails to take
reasonable remedial action.

Pt. 6, § II, Rule 5.1, Rules of Supreme Ct. of Va.

Here, Delafield ratified participation in the Sperro Program when he took the case and

filed it. He was also a partner with knowledge of the conduct in question.[78] He knew about the

Sperro Program before he met with the Williamses, and Chern testified that Upright in Chicago

prepared the Rule 2016(b) disclosures, which it still does, and sent them to the local partners.

The Williamses' Rule 2016(b) disclosure came with the reference to Sperro already on it. Once

Delafield saw that, he could have declined to take the case or to file it once the Sperro Program

was disclosed to him. Instead, he decided to move forward. That it turned out to be a scam is

laid equally at his feet. In addition, Rule 5.3 provides as follows:

> With respect to a nonlawyer employed or retained by or associated with a lawyer:
> (a) a partner or a lawyer who individually or together with other lawyers
> possesses managerial authority in a law firm shall make reasonable efforts to
> ensure that the firm has in effect measures giving reasonable assurance that the
> person's conduct is compatible with the professional obligations of the lawyer;
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make
> reasonable efforts to ensure that the person's conduct is compatible with the
> professional obligations of the lawyer; and
>
> (c) a lawyer shall be responsible for conduct of such a person that would be a
> violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1)
> the lawyer orders or, with the knowledge of the specific conduct, ratifies the
> conduct involved; or (2) the lawyer is a partner or has managerial authority in the
> law firm in which the person is employed, or has direct supervisory authority over
> the person, and knows or should have known of the conduct at a time when its
> consequences can be avoided or mitigated but fails to take reasonable remedial
> action.

Pt. 6, § II, Rule 5.3, Rules of Supreme Ct. of Va.

---

[78] The Court has considered both Delafield's and Morgan's experience before this Court, as well as their roles as
primary counsel in the cases before the Court. This is not the circumstance of a junior attorney early in his career
inheriting a matter brought in by a senior partner. *Cf. Blue v. U.S. Dep't of Army*, 914 F.2d 525 (4th Cir. 1990).

Delafield, a partner in the firm, also bears equal responsibility for the actions of the

Upright sales staff touting and pushing the Sperro Program, as well as their unauthorized practice

of law.[79]  These are not trifling matters just requiring more sales staff education or training.[80]

The "senior client consultants," as outlined above in Part I(A), engaged in numerous instances of

providing impermissible legal advice to potential clients, albeit alleged violations of Upright's

policies, and some of it was just outright wrong, such as advising clients to hide collateral or

leave certain debts off their schedules.  Coupled with the pressure to hit sales and commission

targets, the fact that sales people engaged in overreaching conduct is not surprising.  Chern

testified that these are isolated instances and not illustrative of Upright's usual practices.

However, that the instances of sales personnel exceeding their ethical boundaries just happen to

be in the cases before this Court is a coincidence that cannot be ignored.[81]  Delafield professed

---

[79] "Any lawyer who aids a non-lawyer in the unauthorized practice of law is subject to discipline and disbarment. A lawyer has an affirmative duty to report unprivileged knowledge of such misconduct by another lawyer to the appropriate District Committee, and to discontinue his representation of a client when he discovers that his employment furthers the unauthorized practice of law by the client." Pt. 6, § I, Rules of Supreme Ct. of Va.

[80] According to the Rules of the Supreme Court of Virginia, no non-lawyer shall engage in the practice of law in Virginia. The Rules define the practice of law as follows:

(B) *Definition of the Practice of Law.* - . . .
   Generally, the relation of attorney and client exists, and one is deemed to be practicing law whenever he furnishes to another advice or service under circumstances which imply his possession and use of legal knowledge or skill.
   Specifically, the relation of attorney and client exists, and one is deemed to be practicing law whenever –
      (1) One undertakes for compensation, direct or indirect, to advise another, not his regular employer, in any matter involving the application of legal principles to facts or purposes or desires.
      (2) One, other than as a regular employee acting for his employer, undertakes, with or without compensation, to prepare for another legal instruments of any character other than notices or contracts incident to the regular course of conducting a licensed business. . . .
      (4) One holds himself or herself out to another as qualified or authorized to practice law in the Commonwealth of Virginia.

Pt. 6, § I, Rules of Supreme Ct. of Va.

[81] In response to the argument that Upright facilitates the unauthorized practice of law, Upright asserts "[t]hat notion is both over simplified and unproven. While admittedly in these two cases senior client consultants violated protocols and arguably gave consumers legal advice, the Trustee has presented no evidence of their actions being

ignorance about much of what the sales people did and how the cases were handled in Chicago. He knew few in firm leadership other than Chern or their roles at Upright. He knew little about how his Upright clients' funds were handled in Chicago.[82] He should have known more about all of these matters. Delafield also has a past disciplinary history with this Court, specifically designed to correct past practice deficiencies in this Court. The Court believes lesser discipline would not be effective. Delafield's privileges to practice in this Court shall be revoked for a period of one (1) year, and Delafield will be sanctioned $5,000.00 to be paid to the Williamses, both to take effect within thirty (30) days of the Court's Order becoming final and unappealable.

Morgan is another matter altogether. Morgan, more so than Delafield, was defiant in his testimony, taking little responsibility for anything. That he relied on his partners or his staff was a frequent Morgan refrain. He, too, bears responsibility for filing a case before this Court in which his client was put into the Sperro Program. He received Chern's Sperro rollout memo and knew Scott was in the program from the start. Morgan, Tr. 47-48, Day 4. Moreover, his actions in trying to advance the attorney-client privilege to shield his actions and that of Upright's were self-serving and in conflict with Scott's interests. The responsibility for Upright actions attributable to the salespeople are as equally applicable to Morgan as to Delafield.

However, one of Morgan's practices, which he had no qualms about, is that he often does not meet with his clients in person, much less meet with them to go over and witness schedules being signed. He often leaves that to his wife, a non-attorney, who he testified has "a superior knowledge of the law" in that area. In this case, the first time he laid eyes on Jessica Scott was at

---

widespread." Upright Defendants' Post-Trial Brief at 72. The sampling of the client consultants' actions in this case, combined with evidence as a whole, was enough to satisfy the Court that Upright has serious oversight issues.
[82] *Cf.* Delafield, Tr. 167-68, Day 2.

her deposition on June 2, 2017, nearly a year and a half after her case was filed.[83] As Judge

Phillips stated in *In re Smith*, "[b]ankruptcy clients rely on their attorneys to explain an

unfamiliar and complicated process so that they can make informed, appropriate decisions. *In re*

*Alvarado,* 363 B.R. 484, 487 (Bankr. E.D. Va. 2007). An attorney has an affirmative duty to

meet with and counsel his clients, answer any questions the client may have and explain the legal

significance of their actions." *In re Smith*, No. 13-31565-KLP, 2014 WL 128385, at \*6 (Bankr.

E.D. Va. Jan. 14, 2014). Judge Kenney in the Eastern District of Virginia echoed the same

sentiment, advising that "despite these advances in technology that allow parties to communicate

remotely and to file papers electronically with the Court, there is still a fundamental duty to meet

with the client and to obtain the client's original signature on the petition. The filing of a

bankruptcy petition is an important, life-altering decision. The client must consider the risks (the

damage to one's credit, the transactional fees, and the possibility of a failed Chapter 13 plan after

paying into the plan for some period of time) with the potential rewards (the automatic stay, a

discharge and the possibility of a strip-off of wholly unsecured liens)." *In re Tran*, No. 14-

11837-BFK, 2014 WL 5421575, at \*7 (Bankr. E.D. Va. Oct. 17, 2014). Leaving it to a lay

person to meet with the client, go over the petition and schedules, verify their accuracy, explain

the ramifications, answer questions, and obtain the signature is beyond the pale in this Court.[84]

---

[83] This brings up Morgan's use of appearance attorneys. James McMinn, Morgan's former associate, was sent to the 341 meeting for Scott. He never met her prior to that meeting, and he spoke to her for the first time "in the moments before the 341." UST Ex. 31, Tr. p. 110. In addition, she was a client of Upright Law, not one of Morgan's separate law firm where McMinn was employed. Lines of separation between the two firms appear to have been blurred, if non-existent. This too is unacceptable and shall stop.

[84] Delafield and Morgan are both further reminded of their obligations under 11 U.S.C. §§ 707(b)(4)(C) and (D), as well as Fed. R. Bankr. P. 9011 and Local Rule 5005-4(B). *See First State Bank of Newport v. Beshears (In re Beshears)*, 196 B.R. 468, 472, n.2 (Bankr. E.D. Ark. 1996) ("At least one of the signatures purporting to be [the debtor's] was executed by his attorney. This is a violation of Rule 9011 which requires pleadings, *except a list, schedule, or statement, or amendments thereto,* to be signed by an attorney. The petition and schedules are required to be signed, under oath by the debtors themselves."). The cavalier manner in which such matters were handled in these cases will also stop.

This is unacceptable practice, and this practice shall stop. The Court also notes Morgan has a past disciplinary record with the Virginia State Bar more severe than that of Delafield, and it believes that lesser discipline would not be effective. Morgan's privileges to appear before this Court, directly or indirectly, including through his PLLC, shall be revoked for eighteen (18) months, and Morgan will be sanctioned $5,000.00 to be paid to Jessica Scott, both to take effect within thirty (30) days of the Court's Order becoming final and unappealable.[85]

Sperro, LLC is in default. Sperro is directed to disgorge immediately all funds received from (1) the sale or disposition of any property for which it remitted funds to LSC/Upright in connection with a case filed in this Court, and (2) any funds paid to it by or on behalf of a lender to recover that lender's collateral in connection with a case before this Court. Sperro shall provide full documentation to the UST of all such transactions. All such funds shall be paid to the Clerk of this Court, to be held in the Clerk's registry pending further order of this Court. Sperro shall also, to the extent it has not already done so, provide to the Office of the United States Trustee a list of all clients referred to it from LSC/Upright nationally, as well as details pertaining to the recovery, sale, disposition and/or secured creditor redemption of any collateral in connection with the so-called New Car Custody Program.[86]

---

[85] The Williamses and Ms. Scott have been put through much stress, anxiety, and inconvenience in this case, including having to take time to appear for depositions and/or court. The Court believes directing Delafield and Morgan to pay them the sum indicated is an appropriate sanction in combination with their revocation of privileges to practice before this Court. The Court's Order will also impose continuing legal education requirements in both fundamentals of bankruptcy law and ethics on Delafield and Morgan.

[86] Section 526(c)(5)(B) provides, in part, that ". . . if the court . . . finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court *may* . . . –(B) impose an appropriate civil penalty against such person." 11 U.S.C. § 526(c)(5)(B) (emphasis added). Because the Court has already imposed sanctions against LSC, Upright, Delafield and Morgan, including fining LSC and Upright, and sanctioning Delafield and Morgan $5,000.00 each, the Court elects to exercise its discretion and not award a separate civil penalty against LSC, Upright, Delafield and Morgan under Section 526(c)(5)(B). Williams Count V and Scott Count IV are dismissed.

61

## CONCLUSION

Bankruptcy courts have long recognized that Congress sought to enact certain provisions of the Bankruptcy Code so that lawyers would preserve the integrity of the bankruptcy process and not treat bankruptcy matters as "matters of traffic." *See In re Worldwide Direct*, 316 B.R. at 646 and cases cited therein (addressing Section 504 of the Bankruptcy Code). The Bankruptcy Code provisions and Rules in play here are part of a larger structure, all of which operate in their own way to support those same goals. The integrity of the bankruptcy process was a distant thought in these cases. The pursuit of the next dollar of compensation was the primary consideration here, by Sperro, LSC/Upright, its organizers, and its local partners.

Local attorneys joining multi-jurisdictional law firms as local or limited partners cannot be both tall and short. An attorney cannot claim to be a partner in the firm and file cases with the Court as lead counsel, but yet claim no responsibility for what happens in the main office on the files the attorney decides to take. Attorneys considering joining firms with this business model should understand that, in this Court, while an injury might be initiated elsewhere – there is a real possibility the pain is going to be felt at home.[87]  An appropriate Order shall issue.

**Decided this 12th day of February, 2018.**

UNITED STATES BANKRUPTCY JUDGE

---

[87] This was a difficult and vigorously contested case, and trial counsel on both sides are commended for their efforts. As a suggestion to the UST, if in the future deposition testimony is to be used at trial – and that deposition testimony refers to an exhibit – it would be helpful to the Court and anyone else reading the transcript to have the court reporter mark the exhibit for identification so everybody knows what document the witness is talking about. Tr. 261-64, Day 2.

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 11 2019

JULIA C. DUDLEY, CLERK
BY: H. Beeos
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JASON ROYCE ALLEN, et al., )
)
    Defendants-Appellant, )    Civil Action No.    7:18-cv-00134
)                         5:18-cv-00057
v. )
)
JOHN P. FITZGERALD, )
Acting Trustee for Region Four, )
)     By: Hon. Michael F. Urbanski
)     Chief United States District Judge
    Plaintiff-Appellee. )
)

## MEMORANDUM OPINION

    This is an appeal of an order by the United States Bankruptcy Court for the Western District of Virginia pursuant to 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001. On February 12, 2018, the bankruptcy court entered an order and memorandum opinion resolving the adversary proceeding and on March 12, 2018, the bankruptcy court granted appellants' motion to amend the bankruptcy court order. On March 26, 2018, appellants filed an amended notice of appeal of the bankruptcy court's February 12, 2018 order, as amended. For the reasons that follow, this court **AFFIRMS** the bankruptcy court's February 12, 2018 order in part as it relates to the practice revocation imposed against appellants Kevin Chern, Jason Allen, and Law Solutions Chicago, LLC, d/b/a Upright Law, LLC ("LSC") and the practice revocation and monetary sanctions imposed individually against appellants Darren Delafield and John C. Morgan, Jr., **REMANDS** in part to the bankruptcy court for consideration of the ability of Chern, Allen, and LSC to pay the monetary sanctions imposed against them, and **VACATES**

Exhibit
2

the bankruptcy court's order in part as it pertains to the monetary sanction imposed against appellant Edmund Scanlan.

I.

This case concerns the power of the United States Bankruptcy Court for the Western District of Virginia to impose practice and monetary sanctions for conduct it found to be in bad faith in connection with two consumer bankruptcy cases in this district. The case involved LSC, an Illinois consumer bankruptcy law firm that operates on a national basis, affiliating with local bankruptcy attorneys. Allen and Chern are members of LSC, with Chern serving as its managing partner and Allen its chief operating officer. Scanlan, not a lawyer, is LSC's executive director. Delafield and Morgan are Virginia lawyers who, in association with LSC, represented Timothy and Adrian Williams and Jessica Scott, in their Chapter 7 bankruptcy cases in this district.

After a four-day trial, the bankruptcy court found that LSC's hard-sell marketing practices and involvement in a scheme, known as the Sperro Program, which operated to undermine the secured position of vehicle finance companies, was in bad faith. The bankruptcy court imposed practice and monetary sanctions on the appellants. The bankruptcy court concluded:

> Considering (1) the hard sell tactics encouraged on its sales people, (2) the transcripts of the actual recordings of the calls with clients, (3) the lack of supervision and control over its salespeople in connection with the unauthorized practice of law, due in no small part to the commission and sales structure imposed upon them, (4) the focus on cash flow over professional responsibility, and (5) the participation in the Sperro Program and the record as a whole, including Upright's efforts to get the Williamses and Scott to assert the attorney-client privilege in a thinly-veiled attempt to cover its own tracks, this Court believes

2

that the Upright Defendants have acted in bad faith and the privileges of LSC, Upright Law, Chern, and Allen to file or conduct cases, directly or indirectly, in the Western District of Virginia shall be revoked for a period of five (5) years. This includes any firm that LSC, Upright Law, Allen, or Chern, directly or indirectly, have an ownership interest in or control over. Further, LSC, Upright, Chern, Allen, Scanlan and Sperro shall be fined collectively the sum of $250,000.00. Chern shall be separately and personally fined the sum of $50,000.00 for his participation in and leadership of the Sperro scheme. Given LSC's financial resources and revenues in particular, as reflected by its tax returns and evidence of receipts from residence of the Western District of Virginia, these sums are appropriate in an effort to deter future misconduct. A lesser sanction would not be more appropriate.

Bankruptcy Opinion ("Bankr. Op."), ECF No. 75, at 506–07.

The bankruptcy court also sanctioned Delafield and Morgan, the Virginia lawyers, for their individual failings. Delafield's privilege to practice in this district was revoked for one (1) year and he was sanctioned $5,000, to be paid to the Williamses. Morgan received an eighteen (18) month revocation and was sanctioned $5,000, payable to his client, Ms. Scott.

Appellants filed this appeal contending that the bankruptcy court lacked the authority to impose the practice and monetary sanctions. First, appellants argue that the practice revocation is an injunction as to which the bankruptcy court lacked jurisdiction. Second, they argue that the monetary sanctions were imposed in violation of due process as they were excessive, and appellants had no opportunity to present evidence of their ability to pay. Third, appellants argue that the United States Bankruptcy Trustee waived the ability to defend any monetary sanction above $5,000.00. Fourth, appellants contend that the bankruptcy court exceeded its statutory and inherent powers in imposing the monetary sanctions without specifying the future misconduct to be deterred. Fifth, appellants argue Chern, Allen and

3

Scanlan were not subject to sanctions as they had no role in the Williams and Scott bankruptcy cases. Sixth, appellants argue that the bankruptcy court abused its discretion by sanctioning the Virginia lawyers. Seventh, appellants argue that the monetary sanctions imposed on Scanlan should be vacated for lack of evidence. These arguments will be addressed in turn.[1]

## II.

District courts have jurisdiction to hear appeals from final judgments and orders of the bankruptcy courts. See 28 U.S.C. § 158(a). The district court reviews "[f]indings of fact by the bankruptcy court . . . only for clear error and legal questions are subject to de novo review." See In re Johnson, 960 F.2d 396, 399 (4th Cir. 1992); see also In re Dillon, 189 B.R. 382, 384 (W.D. Va. 1995).[2] The district court "will not reverse the trial court's finding of fact that has support in the evidence unless that finding is clearly wrong." In re ESA Envtl. Specialists, Inc., 709 F.3d 388, 399 (4th Cir. 2013). The district court may only consider evidence presented to the bankruptcy court and made part of the record. See In re Dillon, 189 B.R. at 384; In re Computer Dynamics, Inc., 253 B.R. 693, 698 (E.D. Va. 2000).

The question before the court is whether the bankruptcy court erred in imposing sanctions on appellants pursuant to its inherent power and Bankruptcy Code § 105(a). Appellants assert that the bankruptcy court did not have the authority to impose the practice revocations or monetary sanctions in this case. The court concludes that the bankruptcy court did have the authority to impose the practice revocation sanctions pursuant to its inherent

---

[1] The facts are addressed in great detail in the bankruptcy court's memorandum opinion and will not be restated here, except where pertinent to the issues on appeal.

[2] Unless otherwise noted, the court has omitted internal citations.

authority and the authority to impose monetary sanctions pursuant to its inherent authority augmented by Section 105(a). However, the court finds that the bankruptcy court erred by not permitting appellants Chern, Allen, and LSC to present evidence regarding their ability to pay the sanctions and by sanctioning Scanlan, a non-lawyer, who was not involved in the underlying bankruptcy cases.

"Federal courts possess certain inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Goodyear Tire & Rubber Co. v. Haeger, —— U.S. ——, 137 S.Ct. 1178, 1186 (2017). As such, "[a] federal court also possesses the inherent power to regulate litigants' behavior and to sanction a litigant for bad-faith conduct." In re Weiss, 111 F.3d 1159, 1171 (4th Cir. 1997) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43–44 (1991)). Further, "[a] court has the inherent authority to disbar or suspend lawyers from practice." In re Evans, 801 F.2d 703, 706 (4th Cir. 1986). This inherent power to sanction litigants for bad-faith conduct applies to bankruptcy courts, in addition to Article III courts. See In re Weiss, 111 F.3d at 1171–72 (recognizing the sanctioning power in Chambers applies to a bankruptcy court); see also In re Bowman, Case No. 08-cv-339, 2010 WL 2521441, at *6 (W.D. Va. June 21, 2010) (affirming bankruptcy court order sanctioning attorney based on its inherent authority); In re Heck's Properties, Inc., 151 B.R. 739, 765 (S.D.W. Va. 1992) ("It is well-recognized . . . that [bankruptcy] courts have the inherent authority to impose sanctions upon counsel who [are] found to have acted in bad faith, vexatiously, wantonly or for oppressive reasons"). A court can sanction a party based on its inherent power in conjunction with, or instead of, other sanctioning statutes or rules. In re Weiss, 111 F.3d at 1171; see also Chambers, 501 U.S. at 50

5

("But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules").

Furthermore, bankruptcy courts may take any action or make any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. 11 U.S.C. § 105(a). Section 105(a) provides bankruptcy courts with the authority to hold parties or attorneys in civil contempt. See In re Walters, 868 F.2d 665, 669 (4th Cir. 1989); In re Skinner, 917 F.2d 444, 447 (10th Cir. 1990) (holding that "Section 105(a) empowers bankruptcy courts to enter civil contempt orders"). Pursuant to the authority to enter civil contempt orders, bankruptcy courts can "suspend an attorney from the practice of law," In re Computer Dynamics, 253 B.R. at 699, and "enter monetary sanctions [] for civil contempt." In re Skinner, 917 F.2d at 448. However, the imposition of sanctions is subject to procedural due process requirements. See, e.g., In re Ruffalo, 390 U.S. 544, 550 (1968) (holding that an attorney subject to discipline is entitled to procedural due process); In re Computer Dynamics, 253 B.R. at 699.

Pursuant to either its inherent power or Section 105(a), this court "review[s] for abuse of discretion a [bankruptcy] court's award of sanctions." Six v. Generations Fed. Credit Union, 891 F.3d 508, 518–19 (4th Cir. 2018). "A [trial] court abuses its discretion where it has acted arbitrarily or irrationally, has failed to consider judicially recognized factors constraining its exercise of discretion, or when it has relied on erroneous factual or legal premises." United States v. Welsh, 879 F.3d 530, 536 (4th Cir. 2018). "Unless the sanctioning court has acted

6

contrary to the law or reached an unreasonable result, we will affirm the sanctions decision."
In re Rimsat, Ltd., 212 F.3d 1039, 1046 (7th Cir. 2000).

The court will first examine the sanctions as they apply to the non-Virginia attorneys, Chern, Allen, and LSC. The court will then turn to the sanctions as they apply to the Virginia attorneys, Delafield and Morgan. Finally, the court will review the sanctions as they apply to non-attorney Scanlan.

### III.

The bankruptcy court imposed both practice and monetary sanctions against the non-Virginia attorneys, Chern, Allen, and LSC.[3] First, appellants question whether the bankruptcy court had the authority, either inherent or statutorily, to impose the practice revocation on attorneys that did not appear in the Western District of Virginia. Second, appellants assert that the bankruptcy court erred in imposing the monetary sanctions.

a. Practice Revocation

A court has the inherent authority to disbar or suspend lawyers from practice as a sanction. See In re Snyder, 472 U.S. 634, 643 (1985); see also In re Evans, 801 F.2d at 706. This authority is derived from the lawyer's role as an officer of the court. Id. at 643. The Supreme Court has stated that great discretion must be given to the trial court on decisions to suspend or disbar an attorney:

> On one hand, the profession of an attorney is of great importance
> to an individual, and the prosperity of his whole life may depend
> on its exercise. The right to exercise it ought not to be lightly or

---

[3] The court treats Chern and Allen, as well as the law firm LSC, as the non-Virginia attorneys. See Enmon v. Prospect Capital Corp., 675 F.3d 138, 147 (2d Cir. 2012) ("[t]here is no serious dispute that a court may sanction a law firm pursuant to its inherent power"). Accordingly, the analysis remains the same for the two attorneys and the law firm.

7

capriciously taken from him. On the other, it is extremely
desirable that the respectability of the bar should be maintained,
and that its harmony with the bench should be preserved. For
these objects, some controlling power, some discretion, ought to
reside in the court. This discretion ought to be exercised with
great moderation and judgment; but it must be exercised; and no
other tribunal can decide, in a case of removal from the bar, with
the same means of information as the court itself.

Ex parte Burr, 22 U.S. 529, 529–30 (1824); see also In re G.L.S., 745 F.2d 856 (4th Cir. 1984)

(courts "have the authority to decide, within the bounds of due process, who will be admitted

to practice"). An appellate court owes "substantial deference to the [trial] court" in reviewing

a decision to disbar or suspend an attorney. In re Evans, 801 F.2d at 706; see also In re

Morrissey, 305 F.3d 211, 217 (4th Cir. 2002) (affirming disbarment of attorney and noting the

· "great deference a reviewing court is directed to show to the court which imposes the

disbarment").

The inherent power to disbar an attorney must be exercised with great caution. Byrd v.

Hopson, 108 F. App'x 749, 756 (4th Cir. 2004) (unpublished). The extreme sanction of

disbarment or suspension "must be exercised with the greatest restraint and caution, and then

only to the extent necessary," based on the record before the court. United States v. Shaffer

Equip. Co., 11 F.3d 450, 461 (4th Cir. 1993); see also Resolution Tr. Corp. v. Bright, 6 F.3d

336, 340 (5th Cir. 1993). Attorneys facing practice suspension are guaranteed the right to fair

notice, but not necessarily the right to a hearing. In re Chipley, 448 F.2d 1234, 1235 (4th Cir.

1971) ("Procedural due process in a disbarment proceeding does not require that a hearing be

given to the attorney involved, but he must be given fair notice of the charge against him and

an opportunity to explain and defend his actions").

8

Here, the bankruptcy court invoked its inherent authority and revoked the practice privileges of Chern, Allen, and LSC.[4] Appellants argue that the bankruptcy court lacked authority to sanction Chern, Allen, and LSC because the misconduct that the bankruptcy court found did not occur in the underlying proceedings sub judice. For the reasons stated below, the court concludes that the bankruptcy court did not abuse its discretion in imposing the practice revocation as to Chern, Allen, or LSC.[5]

## 1. The Unauthorized Practice of Law

It is uncontested that Chern, Allen, and LSC did not appear before the bankruptcy court and appellants argue that the authority to suspend or revoke practice privileges only applies to attorneys that are practicing before the court. The court disagrees. As the court held in the August 1, 2018 memorandum opinion, it agrees with the holding of United States v. Johnson, 327 F.3d 554, 560 (7th Cir. 2003). In Johnson, the Seventh Circuit found that "a court's power to regulate and discipline attorneys who appear before it extends to nonmembers of the bar who engage in unauthorized activities affecting the court." Id.

---

[4] The court notes that in another case filed against LSC, the Northern District of Alabama affirmed a bankruptcy court's decision to "rely upon its inherent authority to impose non-monetary sanctions," including an 18-month practice revocation, against LSC as a result of a finding of bad faith conduct. Law Sols. of Chicago LLC v. Corbett, Case No. 18-cv-677, 2019 WL 1125568, at *3 (N.D. Ala. Mar. 12, 2019).

[5] As a preliminary matter, the court has already determined that appellants' argument that the practice revocation is an injunction disguised as a practice suspension fails. Chern, Allen, and LSC contend that the practice revocation was an impermissible injunction entered in a case lacking justiciability. The court addressed this very question in a memorandum opinion filed on August 1, 2018. ECF No. 112. Therein, the court held "that the Practice Revocation is, as a matter of law, not an injunction." The court need not restate its reasoning here and adopts entirely its opinion from the August 1, 2018 memorandum opinion. Accordingly, the practice revocation is not an injunction and the court finds that the bankruptcy court had jurisdiction to impose the practice revocation. See also Matter of Banks, 770 F.App'x 168, 168–69 (5th Cir. 2019), aff'g Law Sols. Chicago LLC v. United States Tr., 592 B.R. 624, 630 (W.D. La. 2018) (adopting district court's opinion affirming bankruptcy court's practice revocation, finding that a "court does not necessarily issue an 'injunction' when it restricts an attorney's ability to practice within its district, or regulate that practice").

9

Likewise, under Virginia law, lawyers are responsible for the unauthorized practice of law of their non-lawyer employees. Pt. 6, § I, Rules of Supreme Ct. of Va.[6] Here, the bankruptcy court found that the non-lawyer employees of LSC were consistently engaged in the unauthorized practice of law affecting the bankruptcy court. See Bankr. Op. 459–60, 506–07.

Chern and Allen, as managing partners of LSC, oversaw this unauthorized practice of law that was fueled by LSC's high-pressure sales environment. The LSC sales staff, known as "client consultants," "engaged in numerous instances of providing impermissible legal advice to potential clients, albeit alleged violations of [LSC's] policies, and some of it was just outright wrong, such as advising clients to hide collateral or leave certain debts off their schedules." Id. at 510. The bankruptcy court found that "[c]oupled with the pressure to hit sales and commission targets, the fact that sales people engaged in overreaching conduct is not surprising" and "[t]he sampling of the client consultants' actions in this case, combined with evidence as a whole, was enough to satisfy the [bankruptcy court] that [LSC] has serious oversight issues." Id. at 510–11, n. 81.

Allen also created and implemented the "Sales Play Book" that encouraged client consultants to "compete against other lawyers for the representation of the clients." Id. at 503, n. 66. The Sales Play Book was "replete with high pressure sales tactics" that made the bankruptcy court determine that LSC was more concerned with closing the sale than representing their clients. Id. at 458. The bankruptcy court was especially troubled by the "now or never" pitch, that included a time sensitive offer to potential debtors and included scripted

---

[6] Pt. 6, § I, Rules of Supreme Ct. of Va. provides, in pertinent part: "Any lawyer who aids a non-lawyer in the unauthorized practice of law is subject to discipline and disbarment."

10

language such as it is "better to ask for forgiveness than ask for permission," when a prospective client said they needed time to discuss the bankruptcy filing with their spouse. Id. While client consultants were instructed that they could not provide legal advice, "in several instances in the matters before the [bankruptcy court], those instructions were not followed by [LSC] non-attorney personnel." Id. at 459. Further, client consultants were paid a base salary of $40,000, plus a commission tied to how many prospects they closed. Id.

Here, the client consultants were involved directly with the debtors in the underlying cases and engaged in the unauthorized practice of law within this district. For example, a non-lawyer client consultant located in Chicago gave Ms. Scott the legal advice that she could leave a debt off her bankruptcy schedule. Id. at 460, n. 12. As such, under Virginia law, Chern and Allen are responsible for the unauthorized practice of law conducted by their subordinates because they aided them by training the employees and implementing the Sales Play Book in the unauthorized practice of law. Pt. 6, § I, Rules of Supreme Ct. of Va. Even though Chern and Allen are non-members of the Western District of Virginia bar, their failure to properly supervise their employees, which led to the unauthorized practice of law in this district, had an impact on the bankruptcy court and the underlying proceedings.

### 2. The Sperro Program

The bankruptcy court found that the Sperro Program was a "scam from the start" and held Chern responsible for its creation and implementation. Bankr. Op. 503, 506. The Sperro Program involved LSC clients surrendering their financed cars to companies operated by nonparty Brian Fenner. The Fenner entities would tow cars out of certain states, including Virginia, "to Fenner-related storage lots in Nevada, Mississippi, or Indiana for the purpose of

11

trying to prime secured lenders, or hold their collateral hostage, with excessive hookup, towing and storage fees that were completely unnecessary." Id. at 468–73. In return the Fenner entities would pay LSC's "clients' attorney's fees and filing fees in order to get the referral from [LSC] to do it." Id. at 472.

From the moment Chern emailed the LSC partners regarding the Sperro program, he was alerted to the questionable nature of the business arrangement. Id. at 472. To further evidence this misconduct, potential debtors, including the Williamses, were offered the Sperro program by LSC's client consultants before the debtor consulted with an attorney. Id. at 472, 504.[7]

The bankruptcy court laid out a detailed factual finding regarding the creation of the Sperro program. See Bankr. Op. 468–78. In essence, Chern created the program to increase the speed and likelihood of receipt of attorney fees. Id. at 503. The bankruptcy court's finding that the Sperro program was created and implemented in bad faith is amply supported by the record and is not clearly wrong. Id. at 507.

### 3. Litigation Misconduct

Chern, Allen, and LSC also engaged in litigation misconduct when appellants "used heavy handed tactics, including text messages, to try and get [Scott and the Williamses] to sign conflict waivers" to allow the appellants to "assert the attorney-client privilege on their behalf and attempt to shield their files and [LSC's] from discovery." Id. at 482–83.

Appellants spill significant ink in their reply brief, ECF No. 120, arguing that the bankruptcy court's finding was clearly erroneous that LSC engaged in bad-faith conduct by

---

[7] Such conduct is also further evidence of the unauthorized practice of law.

attempting to get the Williamses and Scott to assert the attorney-client privilege in an attempt to avoid the United States Trustee's subpoenas. Bankr. Op. 54. The court disagrees. After reviewing the record, the court finds that there is sufficient evidence, including evidence of many emails, text messages, and phone calls from LSC to the Williamses regarding the subpoenas, to support the bankruptcy court's finding that LSC's actions were done in bad faith. Furthermore, in an attempt to obfuscate LSC's conduct, appellants argue that LSC's communications with the Williamses had a sense of urgency because LSC asked an in-house lawyer "to help Williams *two days* before the Williamses' responses were due." Defs.' Reply Br. 10 (emphasis in original). Any such delay in LSC retaining an in-house lawyer to assist with the subpoena response was of the appellants' own doing as there is no claim that the subpoenas were served or filed late. Finally, appellants' reply brief fails to present any evidence as to why LSC's interactions with Ms. Scott pertaining to her subpoena were appropriate. Accordingly, the court affirms the bankruptcy court's finding of fact that LSC's attempts to get the Williamses and Scott to sign the waiver of potential conflict was inappropriate and grounds for sanctions.

### 4. Connections to the Western District of Virginia

Chern, Allen, and LSC were otherwise involved both with the underlying bankruptcy cases of Scott and the Williamses, along with numerous other cases in the Western District of Virginia. Based on LSC's hard-sell tactics and Sales Play Book, it entered into attorney-client relationships with multiple residents of the Western District of Virginia, earning $821,156.52 in attorney's fees. Bankr. Op. 467. Of that, roughly half of the fees, or $409,650.22, were for cases where they actually filed bankruptcy petitions. Id. Prior to September 2015, an LSC

13

"team of document collectors" would "interface with the client and collect all of the documents remotely [and] an associate attorney on staff in Chicago would prepare an initial draft of the petition and do an initial Skype interview with the client.[8] Id. at 462. Therefore, at least some of the fees retained for unfiled legal work must have been earned by attorneys working outside of this district. Chern further testified that the Rule 2016(b) disclosures "were and still are prepared in Chicago." Bankr. Op. 497. Mr. Williams also spoke with multiple non-Virginia licensed attorneys, about various issues, including the legality of the Sperro program. Id. at 475. In the end, the record is clear that legal work was conducted by LSC attorneys who were outside of the Western District of Virginia for clients in this district and LSC client consultants, also located outside of this district, initiated the attorney-client relationship with clients in this district. This sufficiently establishes a nexus between Chern, Allen, and LSC and the cases pending in this district.

Finally, appellants' argument that Chern, Allen, and LSC are beyond the reach of the court's inherent authority because they did not appear before the court mistakenly relies on the wrong definition of what constitutes the practice of law. The Rules of the Supreme Court of Virginia state:

> A person or entity engages in the practice of law when representing to another, by words or conduct, that one is authorized to do any of the following: (a) Undertake for compensation, direct or indirect, to give advice or counsel to an entity or person in any matter involving the application of legal principles to facts. (b) Select, draft or complete legal documents or agreements which affect the legal rights of an entity or person. (c) Represent another entity or person before a tribunal. (d) Negotiate the legal rights or responsibilities on behalf of another entity or person.

---

[8] The Williams' first interaction with LSC was in August 2015.

Pt. 6, § 2, Rules of Supreme Ct. of Va. Here, the LSC client consultants routinely engaged in the unauthorized practice of law, including giving legal advice or counsel for compensation, and lawyers not admitted in the Western District of Virginia selected, drafted, and completed legal documents which affected the legal rights of the debtors in the underlying cases. See also Johnson, 327 F.3d at 561 ("In Illinois, the practice of law includes, at a minimum, representation provided in court proceedings along with any services rendered incident thereto, even if rendered out of court"). The fact that all of this happened in Chicago and not physically within this district is immaterial because it impacted cases in this district.

The court concludes that no matter how you look at it, Chern, Allen, and LSC were engaged in the practice of law in the Western District of Virginia. Further, the bankruptcy court has the inherent authority to suspend or revoke an attorney's ability to appear before them, especially when the court concludes that the attorney acted in bad faith. See Roadway Exp., Inc. v. Piper, 447 U.S. 752, 767 (1980); but see In re Rimsat, 212 F.3d at 1047 (affirming bankruptcy sanctions despite bankruptcy court not explicitly finding bad faith). As such, the bankruptcy court did not err in revoking Chern, Allen, or LSC's authority to practice before the Western District of Virginia for five years.[9]

---

[9] The court also finds that appellants' argument that the sanctions were imposed solely for prelitigation conduct is without merit. While it is true that Chern created the Sperro program before the Scott and Williams' bankruptcies were filed, the Sperro program nevertheless had a direct impact on the underlying bankruptcy cases. Specifically, their cars were towed and sold by Sperro. Bankr. Op. 476, 480. Likewise, examples of the unauthorized practice of law cited by the bankruptcy court also occurred before the underlying bankruptcy cases were filed, yet similar misconduct occurred in the underlying cases, including non-lawyer client consultants advising Mr. Williams to keep his car hidden until the Sperro program could tow it. Bankr. Op. 475.

15

b. Monetary Sanctions

A court may order a monetary recovery under its inherent authority for bad faith conduct by attorneys. Six, 891 F.3d at 519. In addition to the court's inherent authority, Section 105(a) of the Bankruptcy Code preserves the authority of the court to "sua sponte, tak[e] any action . . . to prevent the abuse of process." For example, federal courts can award opponents attorney's fees as a sanction for bad-faith conduct relying on either their inherent authority or Section 105(a). In re Jemsek Clinic, P.A., 850 F.3d 150, 159 (4th Cir. 2017) (inherent authority); In re Rimsat, Ltd., 212 F.3d at 1048 (inherent authority and Section 105(a)).

Appellants assert several issues resulting from the monetary sanctions that the bankruptcy court imposed: (1) the sanctions violated appellants' due process rights as the fines were excessive; (2) the sanctions violated appellants' due process rights as the appellants had no opportunity to present evidence of their ability to pay; (3) the bankruptcy court exceeded its statutory and inherent authority in imposing the monetary sanctions without specifying future misconduct to be deterred; and (4) the United States Trustee waived any monetary sanction above $5,000.00. The court concludes that the bankruptcy court had the authority to impose monetary sanctions, but the amount of the sanctions imposed in this case was such that appellants should have been given an opportunity to be heard on their ability to pay.

1. Excessive Sanctions

Appellants first argue that the sanctions imposed violated appellants' due process rights because the sanctions were excessive. Appellants rely on State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003), which established three guideposts to determine whether

16

a punitive sanction award is grossly excessive.[10] The guideposts are: "(1) [t]he degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." Id. Applying these guideposts to the case at bar, the court cannot conclude the sanctions against Chern, Allen, and LSC are excessive.

First, the bankruptcy court concluded that the hard-sell tactics employed by the client consultants, the lack of supervision of the client consultants, including the ability for them to drink beer on the job, the focus on cash flow, the Sperro program, and a litany of other forms of misconduct all amounted to reprehensible and bad-faith conduct. Bankr. Op. at 507. The court concludes that the record established is sufficient to support the bankruptcy court's conclusion that the appellants acted in bad faith.

Second, appellants argue that the bankruptcy court based its monetary sanctions primarily on appellants' past participation in the Sperro scheme. Appellants further contend that they terminated the Sperro program over two years before the bankruptcy court issued its judgment. While the duration of the Sperro scheme might have been short, it does not otherwise absolve the appellants of the misconduct or establish that the bankruptcy court abused its discretion in imposing the sanctions. In fact, Chern admitted that he felt remorse for the Sperro program and that it "was a horrible mistake." Bankr. Op. 504, n. 67. Rather than demonstrate the disparity between the harm and the amount of the sanctions, this

---

[10] As the government properly points out, Campbell set the standard to review punitive damages, and not the court's inherent or statutory authority to issue monetary relief as a sanction. However, the court finds it a worthwhile comparison and will review the monetary sanctions under the Campbell guideposts.

admission supports the bankruptcy court's conclusion that appellants' actions were reprehensible and committed in bad faith.

Appellants also assert that they mitigated any harm by taking self-corrective measures, such as terminating the Sperro program and changing the Sales Play Book. The bankruptcy court concluded that Chern's testimony "was not credible" when he claimed he did it to self-correct. In fact, Chern "decided to terminate" the Sperro program "due to a variety of factors, one of which was Chern learning from one of his limited partners that a lawsuit was filed by Ally Financial against Sperro and others alleging that the appellants in that case were complicit in converting its collateral." Bankr. Op. 473. While it is true that appellants repaid Scott and the Williamses their filing fees, it did not mitigate all the damages cause by appellants' misconduct.[11]

Appellants seek to limit the ability of the bankruptcy court to sanction them beyond the $5,000 sought by the United States Trustee in its complaint. Plainly, the bankruptcy court has authority to impose sanctions above and beyond that sought by the United States Trustee pursuant to Bankruptcy Code § 105(a) based on a sufficient factual record. Here, the bankruptcy court found that "[g]iven LSC's financial resources and revenues in particular, as reflected by its tax returns and evidence of receipts from residents of the Western District of Virginia, these sums are appropriate in an effort to deter future misconduct." Bankr. Op. 55. Given the extreme nature of the misconduct and the fact that LSC earned over $800,000 in fees from residents of the Western District of Virginia, the court cannot conclude that the

---

[11] In footnote 85, the bankruptcy court found that the damage to the Williamses and Scott was due to more than just the filing fee, including that they were "put through much stress, anxiety, and inconvenience in this case, including having to take time to appear for depositions and/or court." Bankr. Op. 513, n. 85.

18

amount of the sanctions is clear error or an abuse of discretion. See Law Solutions of Chicago, LLC v. Corbett, Case No. 18-cv-677, 2019 WL 1125568 (N.D. Ala. Mar. 12, 2019) (affirming $150,000 sanction against LSC).

## 2. Ability to Pay

Appellants next assert that the bankruptcy court violated their procedural due process rights by implementing a sanction that was 12 times that requested by the United States Trustee without permitting appellants to present evidence regarding their ability to pay the sanction. While this court need not determine if In re Kunstler, 914 F.2d 505, 524 (4th Cir. 1990) applies outside the context of Fed. R. Civ. P. 11 violations, its analysis is helpful in this context. The Fourth Circuit held that "[w]hen the monetary sanction is large [] the parties should generally be given the opportunity to submit affidavits on their financial status, or to submit such other evidence as the court's discretion permits." Id. Here, the court finds that a $300,000 sanction is significantly large to warrant appellants' need to argue their ability to pay. The bankruptcy court determined that Chern, Allen, and LSC could pay the large sanction only based on Chern and Allen's salaries, LSC's tax returns, and legal fees paid by residents in this district. Bankr. Op. 507. The court concludes that the record established by the bankruptcy court did not sufficiently take into consideration appellants' ability to pay. Accordingly, the court remands to the bankruptcy court for an evidentiary hearing on Chern, Allen, and LSC's ability to pay the monetary sanctions.

## 3. Deterrence

Appellants argue that the bankruptcy court exceeded its statutory and inherent powers by imposing monetary sanctions without specifying the future misconduct to be deterred. The

19

bankruptcy court concluded that the sanctions were imposed to "deter future misconduct." Bankr. Op. 507. It is clear from the record the bankruptcy court wanted to deter appellants from continuing the heavy-handed sales tactics employed by the client consultants pursuant the Sales Play Book, entering into another program similar to Sperro, and engaging in litigation misconduct. The court finds that based on this record the imposition of monetary sanctions was not clearly erroneous or an abuse of discretion, but rather was proper as a deterrent for future misconduct.

## IV.

The bankruptcy court imposed a one-year practice revocation and $5,000 sanction and an eighteen-month practice revocation and $5,000 sanction on Delafield and Morgan, respectively. Appellants claim the bankruptcy court erred in imposing the practice revocation and the monetary sanctions for Delafield and Morgan's involvement in LSC's misconduct, including the Sperro program, and their individual failings in the representation of their clients were in error. The court concludes that the bankruptcy court established a record finding that both Delafield and Morgan acted in bad faith and, thus, did not abuse its discretion or engage in clear error by sanctioning Delafield and Morgan. See Six, 891 F.3d at 519.

It is undisputed that the bankruptcy court has the authority to impose the practice revocation on Delafield and Morgan. See In re Evans, 801 F.2d at 706. Moreover, as discussed above, bankruptcy courts have the authority, both pursuant to their inherent power and Section 105(a), to impose sanctions on litigants for bad-faith conduct. See, e.g., Six, 891 F.3d at 519; 11 U.S.C. § 105(a). Because the court reviews the bankruptcy court's determination for an abuse of discretion, the question is if "it has acted arbitrarily or irrationally, has failed to

20

consider judicially recognized factors constraining its exercise of discretion, or [if] it has relied on erroneous factual or legal premises." Welsh, 879 F.3d at 536.

With respect to Delafield, the bankruptcy court properly acknowledged that he did some things correctly in his representation of the Williamses. Bankr. Op. 508. However, as a partner of LSC, he also is responsible for the shortcomings of the firm. The bankruptcy court found that LSC's attorneys regularly ignored, and to a certain extent, encouraged, the unauthorized practice of law by LSC's sales consultants. The bankruptcy court recognized that Delafield was not a managing partner of LSC but found that was not an excuse for violating the ethical rules.[12] Accordingly, Delafield, is responsible for the acts of the other LSC attorneys. See Va. Rule of Prof. Conduct 5.1(c).[13]

The bankruptcy court also found that Delafield engaged in some misconduct with respect to his representation of the Williamses, including claiming to not know about the Sperro program during the 341 creditors meeting.[14] Id. at 508. In fact, despite Delafield's denial, "he knew full well what the Sperro program was and how it worked." Id. The record

---

[12] Appellants argue that Delafield and Morgan were not part of the firm's management and should not be held responsible for the Sperro program or the rampant unauthorized practice of law at LSC. The court finds this argument disingenuous. Appellants argue Chern, Allen, and LSC are not liable for the misconduct because they were not involved in the cases before the bankruptcy court. Yet, appellants maintain that Delafield and Morgan are also not liable because their involvement was limited to the cases before the bankruptcy court. Therefore, appellants would have the court decide that no party is liable for the bad-faith conduct that the bankruptcy court found.

[13] The Virginia Rule of Professional Conduct 5.1(c) provides: "A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if: (1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."

[14] A 341 creditors meeting is a meeting convened by the United States Trustee of creditors where questions are presented to the debtor, under oath, pertaining to the bankruptcy filing. 11 U.S.C. § 341.

21

reflects that Delafield "knew about the Sperro program before he met with the Williamses" and the Rule 2016(b) disclosure, that Delafield filed, identified that Sperro would pay the filing fee for the Williamses. Bankr. Op. 509.

With respect to Morgan, the same holds true as to his knowledge and involvement with the unauthorized practice of law at LSC and the use of the Sperro program. However, the bankruptcy court also found that Morgan's individual failings in his representation of Scott required a more severe sanction than Delafield. Specifically, Morgan delegated to his non-lawyer spouse, who was employed as a paralegal in his office, the responsibility to prepare, review, and witness the signatures of his client's petitions. The bankruptcy court found this to be "beyond the pale." Bankr. Op. 512. Morgan "did not review Scott's petition or schedules . . . [and] did not witness Scott sign them." Id. at 479. In fact, "the first time [Morgan] laid eyes on Jessica Scott was at her deposition on June 2, 2017, nearly a year and a half after her case was filed." Id. at 511. Instead, Morgan had his spouse meet with Scott and sent a law partner to the 341 creditors meeting.

Finally, the bankruptcy court relied on both Delafield and Morgan's prior disciplinary records before this court, and others, to determine that a lesser sanction would be ineffective to deter future misconduct. Accordingly, the court concludes the bankruptcy court did not abuse its discretion in imposing the practice revocation or monetary sanctions on Delafield or Morgan.

## V.

With respect to Scanlan, the bankruptcy court found him jointly and severally liable for the sanctions imposed on Chern, Allen, and LSC. Appellants argue that these sanctions should

22

be vacated for insufficient evidence, and the court agrees. The bankruptcy court held Chern, Allen, Scanlan, and LSC liable for $250,000 of the total sanctions imposed. As described above, Chern, Allen, and LSC were intimately involved in the misconduct that led to the sanctions. However, Scanlan is linked to the misconduct only through his ownership interests in Mighty Legal, LLC, Justiva, LLC, and Royce Marketing, LLC, his leadership of LSC's marketing efforts, and one email sent to Fenner regarding the Sperro program. Id. at 456, 507. These connections are insufficient to find that Scanlan was responsible for any of the misconduct leading to the sanctions. Because the court finds that the record does not support sanctioning Scanlan, the court holds that the bankruptcy court abused its discretion and vacates the monetary sanctions as they apply solely to Scanlan.

## VI.

For the reasons stated above, the court **AFFIRMS** the bankruptcy court's February 12, 2018, order, as amended, in part as it relates to the practice revocation of Chern, Allen, and LSC and the practice revocation and monetary sanctions of Delafield and Morgan, **REMANDS** in part to the bankruptcy court for consideration of the ability of Chern, Allen, and LSC to pay the monetary sanctions imposed against them, and **VACATES** in part the sanction as it relates to Scanlan. A corresponding Order consistent with this Memorandum Opinion will be entered this day.

23

It is so **ORDERED**.

Entered: 12/11/19

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge